Albert REINFELD, on behalf of
himself and all others similarly
situated, Plaintiff,

v.

Meshulam RIKLIS, Ernest Saunders,
Thomas J. Ward, Schenley Industries,
Inc., and Guinness PLC, Defendants.

SCH INDUSTRIES, INC., (formerly
known as Schenley Industries,
Inc.), Counterclaim Plaintiff,

v.

Albert REINFELD, individually and as
representative of all others similarly
situated, Counterclaim Defendant,

and

Herman I. Merinoff, Louis L. Geller, An-
drew M. Crisses and Beatrice Renfield,
Additional Counterclaim Defendants.

No. 87 Civ. 6736 (LLS).

United States District Court,
S.D. New York.

Oct. 12, 1989.

Weil, Gotshal & Manges, New York City, for plaintiffs; Robert G. Sugarman and Richard G. Tashjian, of counsel.

Rubin, Baum, Levin, Constant & Friedman, New York City, for SCH Industries, Inc.; Martin J. Schwartz, of counsel.

## OPINION AND ORDER

STANTON, District Judge.

Plaintiff-counterclaim defendant Albert Reinfeld and "additional counterclaim defendants" Herman I. Merinoff, Louis L. Geller, Andrew M. Crisses and Beatrice Renfield (collectively the "counterclaim defendants") move for an order under Fed.R. Civ.P. 12(b)(6) dismissing defendant SCH Industries, Inc.'s ("SCH") counterclaims against themselves for violation of sections 1962(c) & (d) of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1965 (1982 and Supp. IV 1986) ("RICO"), and dismissing all counterclaims against the former shareholders[1] (the "shareholders") of Renfield Corporation ("Renfield Corp."). SCH moves under Fed. R.Civ.P. 23 to certify all the former shareholders of Renfield Corp. as a counterclaim defendant class.

The counterclaim defendants' motion to dismiss is granted in part and denied in part. SCH's motion to certify a counterclaim defendant class is denied.

---

**1.** The counterclaim defendants were also substantial shareholders in Renfield Corp. However, SCH's pleading treats the named counterclaim defendants and the other shareholders as two distinct groups, except to the extent that both groups are sought to be sued on the counterclaims as one class represented by Albert Reinfeld.

## BACKGROUND

This case arises out of the merger in 1986 of Renfield Corp. with SCH.[2] Renfield Corp. imported, marketed and sold alcoholic beverages. It was the exclusive distributor of Gordon's gin and vodka under a contract with Distillers PLC ("Distillers"), the producer of Gordon's. SCH was a competitor of Renfield Corp.

The parties' main contentions, considerably simplified, follow.

### 1. Plaintiff's allegations

Plaintiff claims that defendant Meshulam Riklis, the Chief Executive Officer of SCH, on several occasions prior to 1986 asked Merinoff, the Chairman of Renfield Corp., if Renfield Corp. was interested in being acquired by SCH. Merinoff always responded that Renfield Corp.'s shareholders were not interested.

According to plaintiff, in early 1986 defendant Guinness PLC ("Guinness") became engaged in a takeover battle with Argyll PLC for control of Distillers. Guinness' bid for Distillers was based on an offering of cash and Guinness' shares. Guinness schemed with Riklis, defendant Ernest Saunders, the Chief Executive Officer of Guinness, defendant Thomas J. Ward, Esq., a member of Guinness' Board of Directors, and others to inflate the price of Guinness stock, in order to make its bid for Distillers more valuable. Specifically, Guinness promised Riklis that in exchange for his purchasing Guinness stock and thus running up its price, when it had taken over Distillers it would award SCH the Gordon's distributorship. Riklis purchased 5.3% of Guinness' stock, which increased its value. Guinness acquired Distillers in April 1986.

On June 7, 1986 Riklis met again with Merinoff and told him that SCH would be awarded the Gordon's distributorship when Renfield Corp.'s distribution agreement with Distillers expired on March 31, 1987.

Riklis told Merinoff that, as a result, Renfield Corp.'s shareholders had no choice but to sell their shares to SCH.

After the meeting, Merinoff called Saunders to get confirmation of Riklis' statements. Someone in Saunders' office advised Merinoff to contact Ward. On June 12, 1986 Ward advised Merinoff that Renfield Corp.'s shareholders should sell to SCH, because Renfield Corp. would indeed lose the Gordon's distributorship.

On June 17, 1986 Merinoff met with Riklis, who said that SCH would purchase Renfield for its book value of five million dollars in cash and $40 million in five-year promissory notes at below-market interest rates.

The complaint alleges that Merinoff then met with Renfield Corp.'s Board of Directors who instructed him to make the best deal possible with Riklis. While Merinoff negotiated with Riklis, Renfield Corp. also sought other buyers. Hiram Walker valued Renfield at $20 million more than Riklis offered, but backed out because of internal reasons and threats made by Riklis.

On October 30, 1986 Renfield and SCH agreed to merge. The purchase price was five million dollars in cash and $40 million in four-year promissory notes at below-market interest rates. The merger closed on December 1, 1986.

At no time prior to the merger did any of the defendants disclose to Renfield Corp. the machinations behind its loss of the Gordon's distributorship.

Accordingly, plaintiff Albert Reinfeld, the President of Renfield Corp., on behalf of all former Renfield shareholders,[3] claims that: (1) Riklis and SCH violated section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b) (1982), and Rule 10b–5, 17 C.F.R. § 240.10b–5 (1986), promulgated thereunder; (2) Saunders, Ward, and Guinness aid-

---

**2.** At the time of the merger SCH was known as Schenley Industries, Inc.

**3.** The Hon. Kevin T. Duffy, U.S.D.J., to whom this case was previously assigned, granted Reinfeld's motion to certify as a plaintiff class all

Renfield Corp. shareholders at the time of the merger, and denied defendants' SCH, Riklis, Guiness, and Ward's motion to dismiss the complaint under Fed.R.Civ.P. 12(b)(1), (c), and 9(b).

ed and abetted Riklis' and SCH's violation of section 10(b) and Rule 10b–5; (3) all defendants violated section 1962(b) of RICO by acquiring Renfield Corp. through a pattern of racketeering activity; (4) all defendants violated section 1962(d) of RICO by conspiring to violate section 1962(b); and (5) all defendants committed common law fraud.

## 2. SCH's counterclaims

As part of the merger negotiations, Alexander Berk, SCH's Vice President, visited Renfield Corp.'s offices on June 19, 1986 to review its books. Berk was shown a draft of Renfield Corp.'s audited consolidated financial statement for April 1, 1985—March 31, 1986 and an unaudited consolidated financial statement for April 1—May 31, 1986. Renfield Corp. later sent SCH its audited consolidated financial statement for April 1, 1985—March 31, 1986 and unaudited statements bringing that information forward to June 30, 1986.

SCH claims that the counterclaim defendants knowingly inflated Renfield Corp.'s net worth in the consolidated financial statements by (1) overvaluing its accounts receivable by failing to discount rebates and credits given to customers which it had no expectation of collecting, (2) overvaluing its inventory, and (3) failing to disclose losses and the forgiveness of a loan. SCH asserts that in agreeing upon the price it would pay for Renfield Corp. it relied on those financial statements and on misleading representations and warranties and a certificate in the merger agreement assuring their accuracy.

Accordingly, SCH claims that the counterclaim defendants[4] and Renfield Corp.'s shareholders: (1) violated section 10(b) and Rule 10b–5; (2) violated section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a); (3) committed common law fraud; (4) violated section 1962(c) of RICO by conducting the affairs of Renfield Corp. through a pattern of racketeering activity; and (5) violated section 1962(d) of RICO by conspiring to violate section 1962(c).

Renfield Corp.'s shareholders are said to be liable as a class because the counterclaim defendants were acting as their agents:

> Merinoff executed the Agreement for Renfield Corp ... with affirmative written approval of all or most of the members of the Class. (Answer ¶ 102).

* * * * * *

> The members of the Class, as the holders of the common stock of Renfield Corp., were all sent copies of the Agreement prior to voting thereon, were aware of its terms, voted in favor of the consummation of the Agreement, and received and accepted the substantial consideration given by Schenley pursuant to the Agreement. Having accepted the benefits of the Agreement with knowledge of the inducements made to Schenley therein, they are legally liable to Schenley for the fraudulent representations and warranties made by the Counterclaim Defendants and by Renfield Corp. acting through and at the behest of the Counterclaim Defendants. (*Id.* at ¶ 120).

## THE PRESENT MOTIONS

As stated above, the counterclaim defendants move to dismiss the RICO claims against them, and to dismiss all counterclaims against the former shareholders. SCH moves to certify as a counterclaim class all former shareholders of Renfield Corp.

## DISCUSSION

### A. Motion to dismiss counterclaims

On a motion to dismiss, the factual allegations of the counterclaims must be taken as true, *Dwyer v. Regan*, 777 F.2d 825, 828–829 (2d Cir.1985), *reh'g denied*, 793 F.2d 457 (2d Cir.1986), and the counterclaims must be liberally construed and their allegations considered in the light most favorable to SCH. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). Unless it appears that SCH is entitled to no relief under any state of facts which could be

---

**4.** SCH does not allege that Beatrice Renfield violated sections 1962(c) & (d) of RICO.

proved in support of the claims made, the counterclaims should not be dismissed. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957).

1. *The RICO claims against the counterclaim defendants*

a. Section 1962(c)

Evidence of a violation of section 1962(c) "requires a showing of (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985) (footnote omitted).

Racketeering activity is the commission of certain predicate acts, specified in the statute, for which a defendant could be convicted, *id.* at 488, 105 S.Ct. at 3280–81, and a pattern of activity requires proof of at least two such acts, 18 U.S.C. § 1961(5), "that were related and that amounted to, or threatened the likelihood of, continued criminal activity." *H.J. Inc. v. Northwestern Bell Telephone Co.*, —— U.S. ——, 109 S.Ct. 2893, 2899, 106 L.Ed.2d 195 (1989).

██ The predicate acts are related if they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.* 109 S.Ct. at 2901, quoting *Sedima*, 473 U.S. at 496 n. 14, 105 S.Ct. at 3285 n. 14, and previous 18 U.S.C. § 3575(e); *see also U.S. v. Indelicato*, 865 F.2d 1370, 1382 (2d Cir.) (*en banc*), *cert. denied*, —— U.S. ——, 110 S.Ct. 56, 107 L.Ed.2d 24 (1989) (relatedness of acts established by "proof of their temporal proximity, or common goals, or similarity of methods, or repetitions").

██ Continuity does not require proof of multiple schemes. Multiple predicate acts within a single scheme may suffice. *Northwestern Bell*, 109 S.Ct. at 2899. Proof of continuity, or its threat, may be established in a variety of ways.

'Continuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition. [citation] It is, in either case, centrally a temporal concept—and particularly so in the RICO context, where *what* must be continuous, RICO's predicate acts or offenses, and the *relationship* these predicates must bear one to another, are distinct requirements. A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct. *Id.* at 2902 (emphasis in original).

Here, SCH contends that the counterclaim defendants violated RICO by scheming to inflate the purchase price of Renfield Corp. The predicate violations alleged include securities fraud, mail and wire fraud, 18 U.S.C. §§ 1341, 1343 (1982), and inducing persons to travel in interstate commerce in the execution or concealment of a scheme or artifice to defraud, 18 U.S.C. § 2314.

Specifically, SCH claims that (its Answer, ¶¶ 140–141):

140. The Counterclaim Defendants at various times beginning at a date presently unknown prior to 1986 and continuing until December 1986 caused to be prepared, exhibited, and delivered financial statements which were materially false and misleading and which grossly overstated the net worth, current assets, and pre-tax earnings of Renfield Corp. They further made or caused to be made affirmative misrepresentations that the Audited Financial Statements for the year ending March 31, 1986 and the Unaudited Financial Statements for the quarter ending June 30, 1986 fairly presented the financial position of Renfield Corp. in accordance with [generally accepted accounting principles], with the purpose and intent of inducing Schenley to enter into the Agreement with Renfield Corp. and pay excessive consideration to themselves and the other mem-

bers of the Class. Such fraudulent conduct on the part of the Counterclaim Defendants was part of a larger pattern of misconduct in their operation of the business of Renfield Corp., which included the provision of statutorily proscribed credits and rebates to selected customers in furtherance of a scheme of direct price support payments in violation of price affirmation laws in numerous states [5]; recording such credits and rebates in a secretly maintained "black book"; and inflating Renfield Corp.'s accounts receivable on its financial statements by failing to recognize or account for such rebates and credits or to establish adequate reserves. The purpose of the Counterclaim Defendants in causing Renfield Corp.'s financial statements to falsely and materially overstate its net worth was to systematically deceive and mislead Renfield Corp.'s licensors, suppliers, and potential acquirers as to Renfield Corp.'s true financial condition.

141. For example, under its distribution agreements with Distillers for Gordon's gin and vodka, Renfield Corp. was required to supply annual audited and quarterly unaudited financial statements to Distillers. The agreement with Distillers in effect at the time of the transaction here in issue permitted Distillers to terminate its agreement with Renfield Corp. immediately (rather than awaiting its scheduled expiration on March 31, 1987), if Renfield Corp.'s net worth fell below the greater of $40 million or two times the maximum amount due and unpaid by Renfield Corp. at any time during the preceding 24 months. In fact, the true net worth of Renfield Corp. had fallen well below $40 million at various times, including all or most of 1986. Upon information and belief, the finan-

cial statements mailed by Renfield Corp., at the behest of the Counterclaim Defendants, to Distillers during 1986 and earlier (like those provided to Schenley as alleged above) falsely and fraudulently overstated Renfield Corp.'s net worth, creating a false impression of financial strength and effectively defrauding Distillers with respect to a valuable contractual right and condition for which it had bargained and to which Renfield Corp. had agreed at the time the then current distribution agreement was negotiated in 1985. In addition, Schenley in the course of its due diligence became aware of the terms of Renfield Corp.'s distribution agreement for Gordon's gin and vodka and was deceived by the conduct of the Counterclaim Defendants as alleged above into believing that Renfield Corp. was in compliance with its obligations under such distribution agreement, misleading Schenley as to a material part of Renfield Corp.'s business.

The counterclaim defendants assert that these allegations fail to state a claim under section 1962(c) because they do not establish the requisite continuity or threat of continuity:

All predicate acts are grounded upon one basic misrepresentation—the net worth of Renfield—allegedly made during negotiations and embodied in the Agreement. Thus, the variety of predicate acts alleged—securities fraud, wire fraud, mail fraud and travel fraud—do not establish a continuity or continuous threat of racketeering activity. They merely reflect the inevitable existence of meetings, telephone calls and documents exchanged in a single business transaction. All properly pleaded predicate acts occurred within the space of approxi-

5. In New York price affirmation laws attempt to "eliminate the undue stimulation of sales of alcoholic beverages and the practice of manufacturers and wholesalers in granting discounts, rebates, allowances, free goods, and other inducements to selected licensees, which contribute to a disorderly distribution of alcoholic beverages, and which are ... contrary to the interests of temperance ..." New York Alco. Bev. Control Law § 101–b.1. (McKinney's 1987). New York requires the owner of a brand of liquor or its wholesaler to file with the State Liquor Authority an affirmation that the bottle and case price of liquor sold to the wholesaler is "no higher than the lowest price at which such item of liquor will be sold ... to any wholesalers anywhere in any other state of the United States...." *Id.* at § 101–b.3.d.

Thus, by giving rebates and credits to wholesalers, Renfield could avoid the price limitations on sales of liquor to wholesalers.

mately seven months, the time required to complete the merger. And, the facts alleged by SCH establish that any alleged racketeering activity will not continue, since the merger prevents any of the Counterclaim or Class Defendants from ever 'conducting the affairs of' or 'participating in' the only enterprise alleged. (Plaintiff's memo in support, p. 25–26; footnote and citations omitted).

Standing alone, this assertion has force. However, SCH alleges the predicate acts were "part of a larger pattern of misconduct in [the counterclaim defendants'] operation of the business of Renfield Corp." SCH can establish continuity if the alleged schemes to defraud it and Distillers, and to violate state price affirmation laws, amounted to "a series of related predicate acts extending over a substantial period of time", *Northwestern Bell*, 109 S.Ct. at 2902, even if the pattern will not continue into the future but relates only to "a closed period." *Ibid.* In this connection one may note that presumably payments on the four-year notes will continue to be collected in the future.[6]

The counterclaim defendants contend that the schemes to defraud Distillers and to violate state affirmation laws do not amount to "a series of related predicate acts" since: (1) they did not involve statutory predicate acts, (2) they are not related "because they had nothing to do with the sale of Renfield Corp. at a purportedly inflated price but instead, were purportedly calculated to appease customers and retain a lucrative contract so that the Counterclaim Defendants could *continue* to operate the corporation profitably", (Plaintiff's reply memo in support, p. 17, n. 14; empha-

sis in original), and (3) they are not pleaded with the particularity required by Fed.R. Civ.P. 9(b).

The scheme to violate state price affirmation laws does not appear to include any of the enumerated predicate acts under section 1961(1). However, the scheme to defraud Distillers sufficiently pleads a violation of the mail fraud statute.[7] While the scheme to defraud Distillers may have had a different purpose than the scheme to defraud SCH, it is nonetheless related because it had a similar method (falsifying Renfield Corp.'s financial statements) and a similar result (defrauding those who dealt with Renfield Corp. as to its actual financial condition). The alleged scheme to defraud Distillers is pleaded with sufficient particularity to notify Renfield of the fraudulent conduct charged and to allow it to prepare a defense, thus satisfying Rule 9(b). *See DiVittorio v. Equidyne Extractive Industries, Inc.,* 822 F.2d 1242, 1247 (2d Cir.1987). Accordingly, the scheme to defraud SCH, when considered with the scheme to defraud Distillers, establishes continuity of racketeering activity. SCH has thus stated a claim for relief under section 1962(c).

### b. Section 1962(d)

To state a claim for a RICO conspiracy, SCH must allege that each of the counterdefendants agreed personally to commit two or more predicate crimes. *United States v. Teitler,* 802 F.2d 606, 613 (2d Cir.1986), citing *United States v. Ruggiero,* 726 F.2d 913, 921 (2d Cir.), *cert.*

---

**6.** *Cf. Beauford v. Helmsley,* 865 F.2d 1386, 1392 (2d Cir.) (en banc), *vacated for further consideration,* —— U.S. ——, 109 S.Ct. 3236, 106 L.Ed.2d 584 (1989), *upheld* by order of September 15, 1989 (allegations in complaint that defendants had mailed fraudulent documents to thousands of persons in connection with the conversion of an apartment complex into condominiums, and that there was a basis to infer that similar mailings would be made in the future, were sufficient to plead a RICO pattern).

**7.** To prove the predicate offense of mail fraud, defendant must establish: (1) a scheme to defraud, and (2) the use of the mails in further-

ance of the fraudulent scheme. " 'A scheme to defraud is a plan whose object is to deprive one of property through fraudulent or deceptive means, such as material misrepresentations [or] concealment.' " *In re Gas Reclamation, Inc. Securities Litigation,* 659 F.Supp. 493, 512 (S.D.N. Y.1987) quoting *Tryco Trucking Co. v. Belk Stores Services,* 634 F.Supp. 1327, 1333 (W.D.N. C.1986). Here, SCH alleges that Renfield mailed false financial statements to Distillers in furtherance of the scheme to deprive Distillers of its contractual right to terminate the distributorship agreement.

*denied,* 469 U.S. 831, 105 S.Ct. 118, 83 L.Ed.2d 60 (1984).

Here, SCH has alleged only that "Defendants Reinfeld, Merinoff, Geller, and Crisses agreed and conspired to conduct or participate, directly or indirectly, in the conduct of Renfield Corp.'s affairs through a pattern of racketeering activity. Each of the Counterclaim Defendants committed, caused to be committed, or *agreed to the commission of, the predicate crimes alleged....*" (Answer, ¶ 149) (emphasis added). This falls short of alleging that each of the counterclaim defendants personally agreed to commit two or more predicate acts. As stated in *U.S. v. Bonanno Organized Crime Family,* 683 F.Supp. 1411, 1441 (E.D.N.Y.1988),

> In the Second Circuit, a required element of a RICO conspiracy is that the defendant himself have agreed to commit two or more predicate acts. [citations] Although the Amended Complaint has alleged the commission of two or more predicate acts by some, but not all, defendants, the commission of the acts is distinct from an agreement to commit them, and a violation of § 1962(d) requires different proof from a violation of § 1962(c). [citations] The RICO conspiracy claim in the instant action is insufficient because it does not allege an agreement by each defendant to commit two predicate acts.

Accordingly, SCH's claim against the counterclaim defendants for violation of section 1962(d) is dismissed.

Since there is no allegation that the shareholders participated in a RICO conspiracy, otherwise than by accepting its benefits (Answer ¶ 152), the same analysis requires dismissal of SCH's claim that the shareholders violated section 1962(d) of RICO.

### 2. *The federal securities law counterclaims against the shareholders*

SCH relies on *AFP Imaging v. Ross,* 780 F.2d 202 (2d Cir.1985), *cert. denied,* 478 U.S. 1004, 106 S.Ct. 3295, 92 L.Ed.2d 710 (1986), to support its assertion that the shareholders are liable for the acts of their agents, Renfield Corp. and the counterclaim defendants. In *AFP,* plaintiff AFP Imaging Corp. ("AFP") and Xenon Industries, Inc. ("Xenon") agreed in writing that Xenon would cause the sale of its shares to AFP in exchange for AFP shares and warrants for additional shares. AFP alleged that there were misrepresentations in the agreement, and sought to hold Xenon's twenty-nine shareholders liable for violations of section 10(b) and Rule 10b–5. The Second Circuit held:

> Although the contract described Xenon as the "seller" of its stock, the district court stated that Xenon was not the seller and that it was [Xenon's shareholders] who sold their stock pursuant to the contract. We agree.

> \* \* \* \* \* \*

> There is no reason, however, why Xenon could not have acted as [the shareholders'] agent in effecting the sale of their stock. Although, ordinarily, a corporation does not act in the capacity of agent for its shareholders, [citation] the shareholders may involve the corporation in their own business affairs to such an extent as to constitute it their agent. [citations] A jury well might find that this is what occurred in the instant case.

> Because Xenon was not the seller and could not unilaterally effect the sale of its own stock, a jury might conclude that Xenon was acting in some sort of representative capacity for [the shareholders], who were the sellers and who clearly benefited from Xenon's acts. Moreover, it is undisputed that [the shareholders] accepted those benefits with full knowledge of the warranties and representations contained in the written contract of sale. Each [shareholder] was required to execute and deliver to AFP an "Investment Representation Letter", in which he acknowledged that he had received and reviewed a copy of the contract. We conclude from the foregoing that this case presents factual issues concerning apparent and implied authority, authority by estoppel, and ratification, that do not lend themselves to summary disposition. [citations] If, in fact, Xenon was acting

as [the shareholders'] agent in making what AFP alleges to be false warranties and representations, [the shareholders], having accepted the benefits with knowledge of the inducements, will be hard put to disassociate themselves from Xenon's allegedly wrongful acts. [citations] *Id.* at 204.

Here, fifty-six shareholders, rather than Renfield Corp., were the sellers of its stock; SCH alleges that the shareholders were sent copies of the agreement before voting on it and were thus aware of its warranties and representations; and the shareholders received economic benefit from the transaction. Moreover, SCH alleges that Mr. Merinoff executed the merger agreement with the shareholders' affirmative written approval, which supports its claim that the shareholders involved Renfield Corp. in their own affairs. This raises triable issues regarding whether the corporation was the shareholders' agent.

■■■ The counterclaim defendants argue that in *AFP* the plaintiff alleged scienter on the part of Xenon's shareholders, while here SCH only alleges that Renfield Corp.'s shareholders were aware of the terms of the agreement. However, scienter on the part of the principal is not required to state a claim under section 10(b) and Rule 10b–5. *Kirkland v. E.F. Hutton and Co., Inc.*, 564 F.Supp. 427, 447 (E.D. Mich.1983) ("Respondeat superior does not do away with the requirement of scienter. Rather, the agent must be found to have acted with scienter, and the conduct of the agent is imputed to the principal party.") SCH has alleged that the counterclaim defendants acted with scienter. (Answer ¶¶ 114–118). Since SCH has sufficiently pleaded an agency relationship, and alleged scienter on the part of the agent, it has stated a claim for violation of section 10(b) and Rule 10b–5.

■■■ Scienter, however, is required to state a claim under section 20(a)[8]. *Index*

*Fund, Inc. v. Hagopian*, 609 F.Supp. 499, 506 (S.D.N.Y.1985) (citing cases); *see also Ingenito v. Bermec Corp.*, 441 F.Supp. 525, 533 (S.D.N.Y.1977) ("§ 20(a) does not impose liability automatically; it is not a statutory incarnation of the common law theory of *respondeat superior*. Only those 'who are in some meaningful sense culpable participants in the fraud perpetrated by controlled persons' are meant to come within the ambit of the provision for vicarious liability.") (quoting *Lanza v. Drexel Co.*, 479 F.2d 1277, 1299 (2d Cir.1973) (en banc)).

Since it fails to allege scienter on the part of the shareholders, SCH's counterclaim against them for violation of section 20(a) is dismissed.

### 3. *Common law fraud*

■■■ As discussed above, SCH has sufficiently pleaded an agency relationship between the shareholders and the counterclaim defendants. The shareholders will be liable for the fraudulent acts of the counterclaim defendants if they were committed within the scope of the counterclaim defendants' authority. *The Chase Manhattan Bank, N.A. v. Perla*, 65 A.D.2d 207, 411 N.Y.S.2d 66, 69 (App.Div.1978). If the counterclaim defendants acted outside their authority, the shareholders will be liable if they later ratified the counterclaim defendants' fraudulent acts and retained the benefits derived from them. *Ibid.*

SCH claims that Merinoff executed the merger with the affirmative written approval of the shareholders, and that the shareholders then voted for the agreement and retained the benefits from it. (Answer ¶¶ 102, 120). SCH has thus alleged that the counterclaim defendants acted within the scope of their counterclaim defendants' authority, the shareholders ratified their acts and retained the benefits derived from them.

---

**8.** Section 20(a) provides:
Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

Accordingly, SCH has stated a claim for common law fraud against the shareholders.

### 4. *RICO*

SCH urges that the principle of respondeat superior can serve as a basis for the shareholders' liability under section 1962(c), arguing that it furthers Congress' goals in creating RICO. *Cf. American Society of Mechanical Engineers v. Hydrolevel Corp.*, 456 U.S. 556, 570, 102 S.Ct. 1935, 1944–45, 72 L.Ed.2d 330 (1982) (applying common law principle of apparent authority in antitrust case because the principle "is consistent with the congressional intent to encourage competition" which animates the antitrust laws.) The *Hydrolevel* case, however, imposed liability upon an association (not upon its individual members) for the anti-competitive acts of some of its members.

 Congress has required that civil RICO liability be based on a showing of implied criminal liability, since section 1961 defines acts as racketeering only if they are one of the enumerated felonies punishable under the laws of the United States. *See Moss v. Morgan Stanley Inc.*, 553 F.Supp. 1347, 1361–62 (S.D.N.Y.), *aff'd*, 719 F.2d 5 (2d Cir.1983), *cert. denied*, 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984). Thus, a principal can only be liable for the acts of his agent if the principal would be subject to criminal liability for his acts. *See Petro–Tech, Inc.* liability for his acts. *See Petro–Tech, Inc. v. Western Company of North America*, 824 F.2d 1349, 1358 (3rd Cir.1987) (holding liability under theory of respondeat superior appropriate if based upon finding of criminal liability for aiding and abetting the predicate acts.)

Here, SCH has not pleaded any acts that would establish the shareholders' criminal liability for any of the predicate act violations. Accordingly, its section 1962(c) claim against the shareholders is dismissed.

### B. Fed.R.Civ.P. 23

 SCH moves to certify under Fed.R. Civ.P. 23(b)(1)(B) or (b)(3) all former Renfield Corp. shareholders as a counterclaim defendant class. It nominates Albert Reinfeld as the class representative.

As a prerequisite for maintaining a class action, SCH must show that "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a).

Assuming that the others are met, SCH fails to satisfy the third and fourth requirements. It alleges that Mr. Reinfeld acted as the shareholders' agent in negotiating the merger agreement. Mr. Reinfeld's defense will likely be that the financial statements, the representations and warranties in the merger agreement, and his Officer's Certificate were not false or misleading. The shareholders' likely defenses will be that any misleading statements were outside the scope of the named counterclaim defendants' authority, and were unknown to the shareholders. Thus, Mr. Reinfeld's defense is not typical of the defenses of the class.

As a result, there is a tension between Mr. Reinfeld's and the shareholders' defenses which would render his representation of the class inadequate. *See* 7A Wright & Miller, *Federal Practice and Procedure*, § 1764, p. 232–33 ("Rule 23(a)(3) assures that the claims of the representative party are similar enough to the claims of the class so that he will adequately represent them.") It is unlikely that Mr. Reinfeld would effectively urge the shareholders' defense that he acted outside the scope of his authority. Indeed, since the shareholders and the counterclaim defendants have defenses that are inconsistent to at least that degree, it is difficult to imagine any class representative that could adequately represent the interests of both groups.

### CONCLUSION

The counterclaim defendants' motion to dismiss SCH's counterclaims against (1)

them for violation of section 1962(c) of RICO and (2) the shareholders for violation of section 10(b) of the Exchange Act and Rule 10b–5 promulgated thereunder is denied. Their motion to dismiss SCH's counterclaims against (1) shareholders for violation of section 1962(c) & (d) of RICO, and (3) the shareholders for violation of section 20(a) of the Exchange Act is granted.

SCH's motion to certify a counterclaim defendant class is denied.

So ordered.