339 F.3d 1087
 McKESSON HBOC, Inc., Plaintiff-Counter-Claimant-Appellant,
v.
NEW YORK STATE COMMON RETIREMENT FUND, INC., individually and as a representative of a defendant class consisting of all persons who exchanged more than 20,000 shares of HBO & McKesson common stock for shares of McKesson HBOC, Inc. common stock on or after January 12, 1999 (as defined herein), Defendant-Counter-Defendant-Appellee.
McKesson HBOC, Inc., Plaintiff-Counter-Claimant-Appellant,
v.
New York State Common Retirement Fund, Inc., individually and as a representative of a defendant class consisting of all persons who exchanged more than 20,000 shares of HBO & McKesson common stock on or after January 12, 1999 (as defined herein), Defendant-Counter-Defendant-Appellee.
 No. 02-15301.
 No. 02-16272.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted April 8, 2003 — San Francisco, California.
 Filed August 13, 2003.
 
 James E. Lyons, Skadden, Arps, Slate, Meagher & Flom LLP, San Francisco, California, and Jonathan J. Lerner, Skadden, Arps, Slate, Meagher & Flom LLP, New York, New York, for the appellant.
 Daniel L. Berger, Bernstein Litowitz Berger & Grossmann LLP, New York, New York, and Alan Schulman, San Diego, California, for the appellee.
 Appeal from the United States District Court for the Northern District of California; Ronald M. Whyte, District Judge, Presiding. D.C. No. CV-01-20021-RMW.
 Before: WARREN J. FERGUSON, M. MARGARET McKEOWN, and JOHNNIE B. RAWLINSON, Circuit Judges.
 OPINION
 McKEOWN, Circuit Judge:
 
 
 1
 This case involves a novel securities fraud claim brought under state law. Essentially, McKesson HBOC is suing its own shareholders for unjust enrichment arising from a merger between McKesson and HBO & Company ("HBOC"). McKesson claims that the former HBOC shareholders are the beneficiaries of a windfall triggered by alleged accounting improprieties by HBOC. The shareholders, according to McKesson, exchanged artificially inflated shares of HBOC for fully-valued McKesson shares in the merger transaction. McKesson now wants to recover the excess value from the shareholders.
 
 
 2
 The parties' respective characterizations of their claims give a flavor of their polarization in this suit. McKesson asserts that it "was badly victimized"; that in an era of corporate fraud, "upstanding corporate citizens" can themselves be defrauded; and that the "HBOC shareholders received a windfall" as a result of the merger. The shareholders claim in their defense that they, too, were "victims of one of the largest corporate frauds in history." Rhetoric aside, the central issue is the ability of a surviving corporation to sue shareholders who benefitted from alleged pre-merger fraud by the acquired entity. Put another way, can the shareholders be required to disgorge a windfall received as a consequence of alleged fraud by corporate officers?
 
 
 3
 Although we are not without guidance on matters of shareholder liability and the sanctity of the corporate form, this particular situation is a matter of first impression. The equitable remedy McKesson seeks — recovery for unjust enrichment — is potentially available only if there is no governing contract between the parties. Our analysis of the record persuades us that no contract governs McKesson's claims, and thus an action for unjust enrichment is not absolutely precluded. Nonetheless, McKesson cannot take advantage of this avenue of equitable relief as McKesson has an adequate remedy at law available against other parties. We also conclude that longstanding principles of corporate law and policies favoring the maintenance of the corporate form are so compelling that we cannot permit McKesson to pierce the corporate veil and obtain a remedy against the shareholders.
 
 BACKGROUND
 
 4
 In January 1999, McKesson, a large drug and health supply company based in San Francisco, California, acquired HBOC, a large healthcare software company based in Atlanta, Georgia, through what is known as a "reverse triangular merger." The acquisition proceeded under an October 1998 Agreement and Plan of Merger (the "Merger Agreement") providing that HBOC would survive as a wholly-owned subsidiary of McKesson. According to the Merger Agreement, HBOC shareholders would have their stock canceled and converted into the right to receive .37 shares of McKesson stock for each share of HBOC stock. The McKesson and HBOC shareholders approved the Merger Agreement and the merger was completed. As a result of the Merger Agreement, HBOC shareholders acquired approximately 64% of the shares of the combined McKesson/HBOC entity.
 
 
 5
 Consummation of the deal represented the second merger dance for McKesson and HBOC. Earlier merger discussions came to a standstill in July 1998 when premature disclosure of the pending merger caused HBOC stock to drop sharply, wreaking havoc with the proposed exchange ratio. In October 1998, McKesson again approached HBOC about merging, albeit on somewhat different terms than the earlier proposed merger. As part of the merger process, McKesson updated its due diligence investigation and conditioned its approval of the merger on receipt of a "fairness" opinion, which was readily provided by Bear Stearns & Co., Inc., an investment banking firm.
 
 
 6
 In April 1999, after the merger was finally consummated, McKesson announced that HBOC had improperly recorded certain software sales as revenue and that it would be auditing and investigating HBOC's financial statements. McKesson's stock price dropped significantly after the announcement. In July 1999, McKesson announced that it was revising HBOC's revenues downward by nearly $50 million for the previous fiscal year, as well as restating revenues for other fiscal years.
 
 
 7
 Several class actions were filed against McKesson and HBOC, as well as officers and directors of both companies, in the United States District Court for the Northern District of California. The district court selected the New York State Common Retirement Fund (the "Fund") as the lead plaintiff for the class plaintiffs; those class actions remain pending in the district court. See In re McKesson HBOC, Inc. Secs. Litig., 97 F.Supp.2d 993, 994 (N.D.Cal.1999).
 
 
 8
 In January 2001, McKesson filed a complaint and compulsory counterclaim against the Fund and former HBOC shareholders who exchanged more than 20,000 shares of HBOC stock for McKesson stock. The complaint alleged claims for unjust enrichment, money had and received, money paid by mistake, and declaratory relief. McKesson's case was consolidated with the class actions. The Fund moved to dismiss the complaint for failure to state a claim under Federal Rules of Civil Procedure 12(b)(6). The district court granted the motion and dismissed McKesson's claims with prejudice and without leave to amend, reasoning that the Merger Agreement, by containing the exchange ratio for the stock, covered the subject matter of McKesson's claims against the HBOC shareholders, and that shareholders cannot be required to disgorge illegal benefit obtained by the actions of the officers of the corporation. Final judgment was entered pursuant to Rule 54(b) on the ground that the order was based on purely legal issues independent of the class action cases.
 
 
 9
 McKesson appeals the district court's dismissal of its claims, arguing that a suit against HBOC shareholders is the only way to recoup its losses because HBOC's status as a wholly-owned subsidiary of McKesson means that any recovery from HBOC as a corporate entity would harm McKesson itself, and rescission of the merger transaction is not practicable because the publicly-traded nature of the stock makes the shareholder population fluid.
 
 STANDARD OF REVIEW AND CHOICE OF LAW
 
 10
 We review de novo dismissals for failure to state a claim under Rule 12(b)(6). McNamara-Blad v. Association of Prof'l Flight Attendants, 275 F.3d 1165, 1169 (9th Cir.2002). We may affirm the district court's judgment on any ground supported by the record. R.T. Vanderbilt Co. v. Babbitt, 113 F.3d 1061, 1063 n. 1 (9th Cir.1997). Dismissal without leave to amend is proper only if "it is clear, upon de novo review, that the complaint could not be saved by any amendment." Lee v. City of Los Angeles, 250 F.3d 668, 692 (9th Cir.2001) (citations and internal quotation marks omitted).
 
 
 11
 The Merger Agreement and Prospectus both have choice of law clauses specifying Delaware law, and both companies were incorporated in Delaware. We therefore rely on Delaware law. Batchelder v. Nobuhiko Kawamoto, 147 F.3d 915, 920 (9th Cir.1998) ("[T]he rights of shareholders in a foreign company ... are determined by the law of the place where the company is incorporated."); see also Restatement (Second) of Conflicts § 302 (1971) (stating that "[i]ssues involving the rights and liabilities of a corporation ... are determined by ... the local law of the state of incorporation" unless "some other state has a more significant relationship to the occurrence and the parties").
 
 ANALYSIS
 I. NO CONTRACT GOVERNS THE PARTIES
 
 12
 Before we address whether McKesson can maintain an unjust enrichment claim against HBOC's shareholders, we must determine whether a contract governs the rights and obligations of the parties. Unjust enrichment is an equitable rather than a legal claim; consequently, no action for unjust enrichment lies where a contract governs the parties' relationship to each other. See ID Biomedical Corp. v. TM Techs., Inc., 1995 WL 130743, at *15, 1995 Del. Ch. LEXIS 34, at *39 (Del. Ch. Mar. 16, 1995) ("A party cannot seek recovery under an unjust enrichment theory if a contract is the measure of [the] plaintiff's right." (internal quotation marks omitted; alteration in original)). There are two candidates for a contract here — the Merger Agreement and the Proxy Statement/Prospectus ("Prospectus") — and we address each in turn.
 
 A. MERGER AGREEMENT
 
 13
 Three entities entered into the Merger Agreement: HBOC, McKesson, and McKesson's wholly-owned subsidiary, known as McKesson Merger Sub, Inc. Although the Merger Agreement necessarily referred to the stockholders of HBOC and McKesson, and specified that the board of directors of each company would recommend "approval and adoption" of the merger to its own stockholders, it is clear from the text and the signatories to the agreement that the only parties to the Merger Agreement were the corporations themselves.
 
 
 14
 Recognizing the uphill battle in establishing an explicit contract between the shareholders and McKesson, the Fund falls back on the notion that the shareholders are third-party beneficiaries of the Merger Agreement and that McKesson therefore cannot maintain an equitable claim. The Fund's argument fails under the explicit language of the Merger Agreement.
 
 
 15
 Under Delaware law, "whether the parties intended to create a third-party beneficiary turns on the contract language." In re Gulf Oil/Cities Serv. Tender Offer Litig., 725 F.Supp. 712, 733 (S.D.N.Y.1989). Section 8.6 of the Merger Agreement, entitled in part "No Third Party Beneficiaries," provides that "This agreement ..., the Option Agreements, the Support Agreement and the Confidentiality Agreement ... are not intended to confer upon any person other than the parties any rights or remedies." In In re Gulf Oil, the court held that nearly identical language "demonstrate[d] that the parties specifically intended not to confer third-party beneficiary status on anyone." 725 F.Supp. at 733. The McKesson-HBOC Merger Agreement's express rejection of any intent to create a class of third-party beneficiaries in the shareholders defeats the claim that the contract regulates the relationship between the stockholders and the merging corporations. At most, the original HBOC shareholders might be considered incidental third-party beneficiaries, a status that provides no legal benefit. See E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber and Resin Intermediartes, S.A.S., 269 F.3d 187, 196 (3d Cir.2001) (holding that if a "third party happens to benefit from the performance of the promise either coincidentally or indirectly, then the third party will have no enforceable rights under the contract"). Because the shareholders do not have third-party beneficiary status under the Merger Agreement, they cannot be sued under that agreement.
 
 
 16
 Although the district court correctly found that the shareholders are not parties to the Merger Agreement, we do not adopt its conclusion that "even though HBOC shareholders were technically not parties to the merger agreement, the principle that an unjust enrichment claim cannot be brought where an express contract covers the subject matter still applies and bars McKesson's claim." This approach, which focuses on the "subject matter" of the parties' dispute rather than the binding obligations of the parties to the contract, ignores the exclusive nature of the contract and would rewrite Delaware third-party beneficiary law. We thus conclude that the Merger Agreement does not bar the unjust enrichment claim.
 
 B. PROSPECTUS
 
 17
 Although the district court relied on the Merger Agreement when ruling in the Fund's favor, the Fund now changes direction slightly and argues that the Prospectus, not the Merger Agreement, is the controlling contract between the parties. In the Fund's view, the shareholders' approval of the Merger Agreement in accord with the terms set out in the Prospectus should be construed as an acceptance of McKesson's offer to sell the newly issued shares, thus creating a contract. This alternative argument fails because the Prospectus was not an offer by McKesson to the HBOC shareholders to enter into a bilateral contract separate and apart from the Merger Agreement.
 
 
 18
 The Merger Agreement formed the foundation of the merger transaction and established the rights and obligations of each party — McKesson and HBOC — to the transaction. In contrast, the Prospectus is a disclosure document (Form S-4) required under the federal securities laws as an adjunct to the Merger Agreement. See 17 C.F.R. § 230.145 (requiring disclosure via a proxy statement/prospectus where "[a] statutory merger or consolidation or similar plan or acquisition in which securities of such corporation ... will become or be exchanged for securities" of another corporation). The Prospectus references the Merger Agreement, advising shareholders that "[t]he merger cannot be completed unless the stockholders of both companies approve the merger agreement and the transactions associated with it."
 
 
 19
 These references do not, however, convert McKesson's solicitation of the shareholders' vote into a contractual offer. Although the Securities Act refers to a prospectus as a communication "which offers any security for sale," 15 U.S.C. § 77b(10), "the term `offer' has a different and far broader meaning in securities law than in contract law," Hocking v. Dubois, 885 F.2d 1449, 1458-59 (9th Cir. 1989) (en banc); see also 15 U.S.C. § 77b(a)(3) (deeming "[a]ny security given or delivered with ... any purchase of securities or any other thing ... to have been offered and sold for value"). Nor can it be said that individual shareholders somehow "accepted" the exchange proposal in the Prospectus. Unlike a tender offer situation, where the courts have found a contract between the corporation and an individual shareholder who tenders shares,[1] the shareholders here did not tender their shares. In fact, the shareholders were told, "Do not send in your stock certificates now." Instead, the shareholders voted to approve the transaction by majority vote and, once the merger was accomplished by operation of law, all HBOC shares were automatically canceled and converted into the right to receive shares in the new company under the Merger Agreement.
 
 
 20
 Indeed, shareholders who objected to the merger could not separately opt out or contract out of the merger. Individual shareholders were not in a position of contracting with McKesson, and shareholder ratification did not convert the Prospectus into a contract. The Fund's effort to equate an offer and acceptance in the realm of contracts with a securities "offer" and ratification is therefore unavailing.
 
 
 21
 In sum, the shareholders were neither parties nor third-party beneficiaries to the Merger Agreement, and the Prospectus did not serve as the basis for a contract between McKesson and the shareholders.
 
 
 22
 II. MCKESSON MAY NOT RECOVER FROM THE SHAREHOLDERS
 
 
 23
 Because no contract governs the relationship between McKesson and the former HBOC shareholders, the door is theoretically opened to McKesson's claim for unjust enrichment. In order to prevail, McKesson must satisfy the five elements of unjust enrichment: "1) an enrichment, 2) an impoverishment, 3) a relation between the enrichment and the impoverishment, 4) the absence of justification and 5) the absence of a remedy provided by law." LaSalle Nat'l Bank v. Perelman, 82 F.Supp.2d 279, 294-95 (D.Del.2000) (citing Jackson Nat'l Life Ins. Co. v. Kennedy, 741 A.2d 377, 393 (Del.Ch.1999)).
 
 
 24
 The Fund argues that McKesson does not satisfy either the first or the fifth element. We agree that the fifth element is not satisfied and thus need not consider the first element. In addition, under the circumstances here, we conclude that, even if the stockholders were theoretically unjustly enriched, and even in the absence of a legal remedy, McKesson may not obtain restitution from the shareholders. The sanctity of the corporate entity, as well as the policies militating against subjecting individual shareholders of a public company to liability for a merger gone bad, defeat McKesson's effort to turn corporate law inside out. We emphasize that unjust enrichment is an equitable remedy; we cannot countenance the inequity wrought by McKesson's efforts to hold the shareholders liable for alleged corporate fraud.
 
 A. ADEQUATE REMEDY AT LAW
 
 25
 McKesson's essential claim is that it was bamboozled into consummating the deal because of HBOC's accounting irregularities. McKesson argues that because neither the Prospectus nor the Merger Agreement covers the former HBOC shareholders, and because it cannot sue its own subsidiary, it must be allowed to pursue an equitable claim against the shareholders. We are not persuaded.
 
 
 26
 McKesson has potential legal claims against any number of parties who, unlike the former shareholders, actually played a substantial role in the decision to enter the Merger Agreement; the former HBOC shareholders are therefore not the only targets for recovery. Possible claims and remedies lie against the former HBOC officers and directors, as well as the phalanx of investment bankers, lawyers, auditors, accountants, and other advisors associated with the transaction. Whether McKesson chooses to pursue these remedies, including recovery under insurance policies required by the Merger Agreement, does not alter the availability of the remedies at law.
 
 
 27
 We find ample support in Delaware law for the principle that an equitable remedy is unnecessary where a legal remedy for the same wrong is available against a different party, although we recognize that the cases on this issue are not entirely in harmony. See, e.g., Griffin Dewatering Corp. v. B.W. Knox Constr. Corp., 2001 WL 541476, at *8-9, 2001 Del.Super. LEXIS 176, at *24-25 (Del.Super.Ct.2001) (denying a claim for unjust enrichment against a contractor on the grounds that the plaintiff had not shown that it could not recover from the subcontractor for whom it worked); Galvagna v. Marty Miller Constr., Inc., 1997 WL 720463 at *3-4, 1997 Del.Super. LEXIS 458, at *9-10 (Del.Super.Ct.1997) (permitting subcontractor to pursue an equitable claim against owners, in part because builders had liquidated, suggesting that availability of builders as legal target would have negated equitable remedy against owners); but see Mort v. United States, 86 F.3d 890, 892 (9th Cir.1996) ("Equitable relief should not be denied ... unless the available legal remedy is against the same person from whom equitable relief is sought.").
 
 
 28
 B. MCKESSON MAY NOT PIERCE THE CORPORATE VEIL
 
 
 29
 Apart from the availability of a legal remedy, McKesson faces a more fundamental problem: permitting its suit and exposing the shareholders to liability would effect an unprecedented piercing of the corporate veil. We cannot accept McKesson's argument that "[i]n concept, McKesson's action to directly retrieve the improper benefit from HBOC shareholders is no different than the Fund's action to recover from HBOC ... or, for that matter, its claims against McKesson." McKesson's effort to characterize a suit against the corporation as a de facto suit against the shareholders because of potential diminution in equity ignores a core concept: corporate liability is not the same as shareholder liability.
 
 
 30
 The corporate form protects shareholders by limiting their liability and their direct control over the corporation. See Japan Petroleum Co. (Nigeria) Ltd. v. Ashland Oil, Inc., 456 F.Supp. 831, 838 (D.Del.1978) ("One of the major features of the corporate form of organization is that it insulates shareholders from personal liability for the debts of the corporation."); see also Stephen M. Bainbridge, Abolishing Veil Piercing, 26 J. Corp. L. 479, 482 (2001) ("Shareholders of public corporations are effectively immune from veil piercing claims."). Indeed, "[c]ourts are reluctant to disregard the separate existence of related corporations by piercing the corporate veil, and have consistently given substantial weight to the presumption of separateness." Kashfi v. Phibro-Salomon, Inc., 628 F.Supp. 727, 732-33 (S.D.N.Y.1986) (internal quotation marks omitted). The corporate entity may be disregarded "only in exceptional circumstances." Mobil Oil Corp. v. Linear Films, Inc., 718 F.Supp. 260, 270 (D.Del. 1989). McKesson contends that such exceptional circumstances are present here. We disagree.
 
 
 31
 It is true that the separation between the shareholder and the corporation is not absolute. Thus, for example, in limited circumstances, such as where the corporation acts as the shareholders' agent, or where the shareholders effectively control the corporation, courts have permitted suits against the shareholders. But McKesson does not allege here that HBOC, which had over 430 million shares of common stock outstanding at the time of the merger, acted as the shareholders' agent or that HBOC was under the control of the literally hundreds of shareholders in the putative class of individuals who exchanged more than 20,000 shares of HBOC stock. Nor could it. The shareholders of a public corporation can hardly be said, as a practical matter, to exercise control over the corporation. As a leading commentator noted, "requiring control screens out piercing against the shareholders of a publicly traded corporation.... This provides a doctrinal underpinning to explain the fact that there never has been a case in which the court pierced to hold shareholders in a public corporation liable for the company's debts." Franklin A. Gevurts, Corporation Law § 1.5.3 (2000) (referencing Robert B. Thompson, Piercing the Corporate Veil: An Empirical Study, 76 Cornell L.Rev. 1036, 1047 (1991)).
 
 
 32
 McKesson's situation thus stands in contrast to those cases involving privately held corporations as takeover targets in which the courts have permitted piercing of the corporate veil.
 
 
 33
 McKesson points to two such cases and argues that they compel a similar result here. In the first, AFP Imaging Corp. v. Ross, 780 F.2d 202 (2d Cir.1985), two companies — AFP and Xenon — signed a contract providing that Xenon would "cause the sale" of its stock to AFP. Id. at 203-04. AFP then sued Xenon's twenty-nine shareholders for fraudulent misrepresentation in the written contract. Id. at 204. The court held that although Xenon's shareholders, not Xenon, actually sold the stock, Xenon may have been acting as the shareholders' agent in effecting the sale, indicating a significant degree of shareholder control over the corporation. The court observed that if "Xenon was acting as [the shareholders'] agent in making what AFP alleges to be false warranties and representations, [the shareholders], having accepted the benefits with knowledge of the inducements, will be hard put to disassociate themselves from Xenon's allegedly wrongful acts." Id. (emphasis added). AFP was therefore permitted to pursue a securities fraud claim against Xenon's shareholders. Id. at 205.
 
 
 34
 In Reinfeld v. Riklis, 722 F.Supp. 1077 (S.D.N.Y.1989), the other case on which McKesson relies heavily, SCH Corporation effected, partially through subterfuge, a merger with Renfield Corporation. After Renfield sued SCH, SCH counterclaimed against Renfield and its shareholders for knowingly inflating Renfield's net worth. Id. at 1079-80. As in AFP, Renfield had a small number of shareholders (fifty-six), each shareholder provided affirmative written approval for execution of the agreement, and SCH alleged an agency relationship between the company and its shareholders. Id. at 1085. Relying in part on AFP, the court determined that triable issues existed as to agency. Id.
 
 
 35
 These cases are consistent with the very limited circumstances in which Delaware law countenances veil piercing: "[t]he degree of control required to pierce the veil is exclusive domination and control ... to the point that [the corporation] no longer has legal or independent significance of [its] own.... Effectively, the corporation must be a sham and exist for no other purpose than as a vehicle for fraud." Wallace v. Wood, 752 A.2d 1175, 1184 (Del.Ch. 1999) (citation and internal quotation marks omitted; some alterations in original). Here there is no allegation that the HBOC shareholders exercised — or even had the ability to exercise — domination or control over HBOC, or that they manipulated HBOC to commit fraud. AFP and Reinfeld do not persuade us that it is appropriate to invoke the extraordinary remedy of disregarding the corporate form to reach the shareholders of a public company.[2]
 
 
 36
 Recognizing that unjust enrichment is grounded in equity, we also conclude that expansion of liability to the HBOC and McKesson shareholders would be unjust. See 1 Dan B. Dobbs, Law of Remedies 563 (2d ed. 1993) ("Courts refuse to permit recovery of restitution even when unjust enrichment is fully established if a restitutionary award would ... be unfair or inequitable on the particular facts of the case."). Such liability was surely not within the scope of any anticipated exposure at the time of shareholder approval. Indeed, the shareholders knew and were specifically advised in the "Risk Factors" section of the Prospectus that a fixed exchange ratio controlled, despite any increase or decrease of the stock price. Risk factors did not include the unprecedented risk that the shareholders could be personally liable for unspecified corporate acts which were neither known to nor countenanced by the shareholders. We are not prepared to add yet another layer of uncertainty and risk to the already complex and drawn out world of securities fraud litigation. Nor, as a federal court, are we willing to create unprecedented shareholder liability under Delaware law.
 
 
 37
 Finally, we briefly address United States v. Dean Van Lines, Inc., 531 F.2d 289 (5th Cir.1976), on which both the parties and the district court heavily relied. We deem the case interesting but neither analogous nor instructive. Because Dean Van Lines involved a suit against a parent company for alleged fraud by a subsidiary, not a suit against shareholders, it is simply inapplicable.
 
 III. LEAVE TO AMEND COMPLAINT
 
 38
 McKesson's final claim is that it should be permitted to amend its complaint to state a claim for — perhaps among other things — rescission of the Merger Agreement. It is nearly impossible to imagine that the Merger Agreement could be rescinded at this late stage, four years after it was signed, and after thousands of McKesson and HBOC shareholders have traded their stock in various ways; unscrambling this particular egg is virtually impossible. See Catamaran Acquisition Corp. v. Spherion Corp., 2001 WL 755387 at *4, 2001 Del.Super. LEXIS 227, at *15 (Del.Super.Ct. May 31, 2001) (holding that "the Court of Chancery would find it impossible to `unscramble the eggs' by rescinding the Agreement" (some internal quotation marks omitted)); see also Aronson v. McKesson HBOC Inc., 79 F.Supp.2d 1146, 1151 (N.D.Cal.1999) (noting that rescission of the merger agreement was unlikely even as of 1999 because the merger was complete). McKesson conceded as much in its less than enthusiastic pursuit of this avenue of relief at oral argument, claiming instead that it was seeking rescissionary damages rather than rescission. This approach is a distinction without a difference and suffers from the same defects as the primary claim. Like the district court, we conclude that the deficiencies in McKesson's claims cannot be cured by amendment.
 
 CONCLUSION
 
 39
 Neither the Merger Agreement nor the Prospectus controls the relationship between the former HBOC shareholders and McKesson. Nevertheless, because of the importance of the corporate form and the policy justifications underlying the retention of limited liability for shareholders of a public company, McKesson may not maintain a claim for unjust enrichment against the former HBOC shareholders. We therefore affirm the district court's dismissal of McKesson's complaint and compulsory counterclaim. We also affirm the district court's refusal to permit McKesson to amend its complaint.
 
 
 40
 AFFIRMED.
 
 
 
 Notes:
 
 
 [1]
 See In re Gulf Oil, 725 F.Supp. at 731.
 
 
 [2]
 We also note that the claims inAFP and Reinfeld were not equitable ones for unjust enrichment, but were instead legal claims for violations of RICO and the Securities Acts, respectively. See AFP, 780 F.2d at 203; Reinfeld, 722 F.Supp. at 1078.