McCarthy, Admx., Appellee, *v.* Kasperak, Appellant.

(No. 43760—Decided December 10, 1981.)

*Mr. William C. Todia,* for appellee.
*Mr. August A. Maran,* for appellant.

Day, J. This appeal by defendant-appellant, Irene Kasperak (defendant), is from a jury verdict in an action in common pleas court brought by plaintiff-appellee, Rosemary McCarthy, daughter of Frank T. O'Leary (decedent) and administratrix of his estate (plaintiff), on behalf of the estate. The verdict was for $10,000, plus interest from July 23, 1975. The $10,000 represented the face value of a Treasury Bill, payable to bearer, that was originally purchased by Frank O'Leary but cashed in at maturity by defendant. Defendant assigns two errors. Both attack the weight of the evidence. For reasons adduced below the judgment is affirmed.

I

It is stipulated that Frank O'Leary purchased a $10,000 Treasury Bill, Serial No. 794125C, payable to bearer, on January 16, 1975. The due date on the Bill was July 17, 1975. O'Leary paid $10,000 for the Bill and received back from the federal government a discount check for $336 making his net investment $9,664.

On the night of February 25, 1975, police were called by a neighbor to investigate O'Leary's locked residence. O'Leary had not been seen for a week and his mail had not been picked up. O'Leary's nephew, William O'Leary, was also notified. William O'Leary and his son Pat arrived before the police. The police broke a rear door window to gain admittance. Pat O'Leary discovered Frank O'Leary's dead body in an upstairs bathroom. A coroner's representative arrived and ushered the family members and the neighbors out of the house. Up to this point, no one had been alone in it for more than a few seconds. The two policemen who answered the call and the coroner's representative stayed alone in the building for the next forty-five minutes to one hour. The house was then sealed and remained so until February 27, 1975.

On February 27, 1975, the coroner's investigator and plaintiff's husband, William McCarthy, searched the house for valuables. No Treasury Bill was found.

On March 6, 1975, plaintiff and several other relatives also searched the house. Plaintiff found an envelope and a letter which indicated that Frank O'Leary had purchased a Treasury Bill in January 1975. The Treasury Bill was never found.

O'Leary was a loner who kept very

detailed records of his financial holdings. The purchase of the Treasury Bill was recorded in his January 1975 statement. There is no record in his handwriting to indicate that he sold or disposed of the Bill in any way. A check of his bank records indicates no major deposits between January 16, 1975, and February 25, 1975.

On April 3, 1975, defendant was approached by her longtime accountant, Mel Weinstein, with an offer to sell her a $10,000 Treasury Bill for $9,500. Defendant testified that Weinstein told her he was trying to sell the Bill for another one of his clients, Pete Jensen. Weinstein gave her the bearer bill which she took to her banker, Karol Cooper, a manager of a savings and loan, for his opinion. Although Cooper told her bearer bills were risky because any person in possession could cash it and that there were better investments available, defendant withdrew $5,000 from one savings and loan and $4,500 from another in the form of money orders payable to Weinstein. Defendant endorsed the money orders after Weinstein signed them, cashed them, and gave $9,500 in cash to Weinstein. Defendant stated that it was Weinstein's obligation to pay off the debt to Jensen.

Defendant said that she did not believe Weinstein's request for cash was unusual because she worked in a cash-only business. Defendant only accepted cash in her tavern and she paid all her bills with cash.

Neither Weinstein nor Jensen testified.

The usual market place for Treasury Bills was through banks and stockbrokers. Defendant testified that she had never bought a Treasury Bill before and did not know how its market functioned.

The Treasury Bill was cashed by the defendant on July 23, 1975.

## II

Assignment of Error No. I

"The Court in failing to grant Defendant's Motion to Dismiss at the Conclusion of Plaintiff's Case [sic]."

The record in this case would support a reasonable mind in concluding that the decedent purchased the Treasury Bill in issue before his death and that he had not transferred it, and, at the time of his death, the Bill had been lost or stolen. These facts raise a prima facie case that the deceased was still the owner of the Bill when he died and that the Bill was an asset obligating the federal government to his estate if the estate was in possession of the asset or had a right to be.

This was a jury case. It was not error to overrule a motion to dismiss a prima facie case.

Assignment of Error No. I is without merit.

## III

Assignment of Error No. II

"The verdict of the jury finding for the Plaintiff-Appellee was not supported by the evidence."

This case has proceeded on the assumption that a Treasury Bill is a negotiable instrument and that if defendant is a holder in due course (HDC) she is entitled to the proceeds whether or not the Bill, payable to bearer, was lost or stolen. The deeper premise is that an HDC has a right superior to the whole world including the true owner. If this is so, HDC status cleanses paper of any taint imposed by either thieves or finders. However, disposition here does not depend upon the consequences of HDC status.

One might argue that a Treasury Bill is or is not a negotiable instrument within the meaning of that status for commercial paper.[1] Passing that debate and assuming, arguendo, that an HDC who had

---

[1] See R.C. 1303.02, limitation on scope of chapter, and R.C. 1303.03, form of negotiable instruments; draft, check, certificate of deposit, note defined.

cashed O'Leary's Treasury Bill was entitled to the proceeds avails the defendant nothing. For she is not an HDC. One absolutely necessary prerequisite to that condition is acquisition in good faith.[2] Good faith is defined by statute to mean "honesty in fact in the conduct or transaction concerned."[3] And the jury was instructed that the statutory requirement was not satisfied by ignoring known facts which would suggest the existence of defenses or limitations.[4]

The good faith issue the jury had to decide was whether the circumstances under which the defendant acquired the Bill were such that a reasonable person could have participated in the transaction and been honest "in fact" in believing it a legitimate sale of the Bill. The conclusion depends upon an assessment of the defendant's credibility. It was the jury's function to make that assessment. The jury apparently did not credit the defendant's explanation. On the record it cannot be said that reasonable persons could not have concluded as the jury did in entering a general verdict for the plaintiff.

By virtue of the two-issue rule, a general verdict which is supportable on one or more alternate grounds properly submitted to the jury is invulnerable to attack.[5] Absent the utilization of Civ. R. 49(B) to demonstrate the contrary, the two-issue rule provides an unrebutted presumption in this case that the jury rested its verdict on the conclusion that the defendant was not an HDC because she did not acquire the Treasury Bill in good faith.

Assignment of Error No. II is not well taken.

The judgment of the trial court is affirmed.

*Judgment affirmed.*

PRYATEL, P.J., and CELEBREZZE, J., concur.

---

[2] R.C. 1303.31 (holder in due course):

"(A) A holder in due course is a holder who takes the instrument:

"(1) for value; and

"(2) *in good faith;* and

"(3) without notice that it is overdue or has been dishonored or of any defense against or claim to it on the part of any person." (Emphasis added.)

[3] R.C. 1301.01(S).

[4] "Good faith is a legal term which means honesty, and in fact in the conduct or transaction concerned, one who seeks the protection in due course and one who has dealt fairly and honestly in acquiring the instrument.

"Good faith does not require actual knowledge of an infirmity or limitation. Good faith is not satisfied in one ignoring the facts known to him which would suggest existence of defenses or limitations. In other words, one cannot completely close his or her eyes to what is before him."

[5] See *Sites* v. *Haverstick* (1873), 23 Ohio St. 626, and its progeny.