[Cite as *First Natl. Bank of Omaha v. iBeam Solutions, L.L.C.*, 2016-Ohio-1182.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| First National Bank of Omaha, | : | |
| Plaintiff-Appellee, | : | |
| v. | : | No. 13AP-850 |
| | | (C.P.C. No. 10CV-13889) |
| iBeam Solutions, LLC, et al., | : | |
| | | (REGULAR CALENDAR) |
| Defendants-Appellees, | : | |
| (Edward Panos and | : | |
| Panos Industries, LLC, | | |
| | : | |
| Defendants-Appellants). | | |
| | : | |

D E C I S I O N

Rendered on March 22, 2016

**On Brief:** *Cooper & Elliott, LLC*, and *Barton R. Keyes*, for appellees. **Argued:** *Barton R. Keyes*

**On Brief:** *McDonald Hopkins LLC, Christopher T. O'Shaughnessy, O. Judson Scheaf, III* and *Jason R. Harley*, for appellants. **Argued:** *Christopher T. O'Shaughnessy*

APPEAL from the Franklin County Court of Common Pleas

BRUNNER, J.

{¶ 1} This matter began in the Franklin County Municipal Court as a collection action by the First National Bank of Omaha for $13,531.36 in credit card debt against iBeam Solutions, LLC ("iBeam) and appellee Eric Schmidt ("Schmidt") as guarantor. A third-party complaint was filed by Schmidt, and also by his wife, appellee Brenda Schmidt, and appellee Paul Bursey ("Bursey"), against appellants Edward Panos ("Panos"), Panos Industries, LLC ("Panos Industries"), and iB3 Networks, Inc. ("iB3"), previously known as Language Access Network, Inc. ("LAN"). Default judgment was

entered against iBeam, and in view of the amounts demanded in the third-party complaint, the matter was transferred to the court of common pleas. Following trial, a jury returned verdicts in favor of appellees. After the trial court denied appellants' motions for a new trial and for a directed verdict or judgment notwithstanding the verdict, judgment was entered in the total amount of $2,713,258, including compensatory damages for all three appellees, attorneys' fees, prejudgment interest, and a $500,000 award of punitive damages for Schmidt against Panos individually.

## I.    Facts and Procedural History

{¶ 2}   In 2001 the Schmidts and Bursey founded iBeam as a web development company. It soon became a full-service technology firm. The company's revenues grew to $1.6 million in 2006 and $3 million in 2007. However, iBeam had accumulated significant debt, much of which appellees had personally guaranteed. Due to cash flow issues, the principals began looking to sell the company beginning in late 2004.

{¶ 3}   One of iBeam's clients was LAN, a public company. LAN's primary business was to provide remote foreign and sign language interpretation by audio and video for medical treatment providers. Panos was a shareholder of LAN and at all relevant times was involved directly and actively in company business. He began his career with Reynolds & Reynolds in Seattle, working in sales for the Microsoft Carpoint online car buying system marketed to used car dealers. He later started an online gaming site in Vancouver, learned venture capital and moved to Las Vegas where he took a company named Common Horizons public and sold it, though it did not succeed. He became involved in gold investment. In Ohio, his brother Andrew was part of a company called Preciss, which became LAN. Panos bought into his brother's company for $50,000. Before he took LAN public, Panos had acquired 98% the company. Then he gave half of his shares to Andrew, who already had 1% and had been handling the operations.

{¶ 4}   LAN was pleased with iBeam's work as a contractor, and in July and August 2006 LAN approached Schmidt about a merger of the two companies. Panos offered a plan to buy iBeam and dedicate its technology services and expertise to LAN's interpretation business. It was clear to Schmidt that Panos was the money behind the company and was "calling the shots." (Tr. Vol. II, 59.) At a lunch meeting Panos said he had sold his on-line gambling business for millions, and that he had 15 to 20 million

dollars in the bank. Panos further disclosed to Schmidt a valuation indicating private equity commitments and projecting LAN's worth at $144 million with a projected price per share of $6.85 in 5 years.

{¶ 5}   A letter of intent between the two companies was signed in December 2006. In early 2007, Panos told Schmidt that he had obtained a valuation of iBeam at $1.7 million, and then offered to pay $1 million for the company.   The price was to be reduced by the amount of debt LAN was acquiring, with the balance paid to appellees in the form of shares in the surviving company after the merger. Appellees maintain that Panos personally assured them that their debts (including the personal debts the principals incurred on behalf of the business) would be paid. The debts were to be paid within 90 days, and Panos further advised Schmidt that he had millions of dollars coming in from investment houses.

{¶ 6}   Schmidt expressed concern to Panos over how to afford the $18,000-per-month payroll tax payment iBeam had negotiated with the Internal Revenue Service ("IRS").   Panos said, "If I have to after the merger I'll submit a check for you." (Tr. Vol. II, 76.) Before the acquisition, Panos wrote a check to cover one of the monthly tax payments.  The merger closed on August 1, 2007.

{¶ 7}   The agreement merged a new company created for the purposes of the merger, iBS Merger Sub, LLC,  into iBeam as the surviving company. As specified by the merger agreement, iBeam then became a wholly owned subsidiary of LAN.  Panos' name appears nowhere in the merger documents.  After the merger closed, Schmidt and Bursey each owned 40% of iBeam, and Brenda Schmidt owned 2%, with others holding the remainder.   In addition, Schmidt signed an employment agreement with a base salary of $100,000 per year.

{¶ 8}   However, appellees' debts, listed in the merger agreement at a total of $726,246.43, approximately $726,000, were not paid within 90 days after the acquisition.  Neither was appellees' technology services put to work for the interpretation business, though they had been told by Panos that this was the business reason for the merger. More than 4 months after the closing on the merger, in December 2007, Panos told Schmidt that Panos' brother, Andrew, had "blown his money" and that the medical

interpretation business, LAN's original business activity, would be spun off. (Tr. Vol. II, 82.)

{¶ 9} LAN's spinoff was achieved via a January 16, 2008 acquisition agreement: LAN sold its 100% interest in Language Access Network, LLC ("T-LAN") to Interim Support, LLC, ("Interim Support") expressly excluding LAN's interest in iBeam. The software and systems developed by iBeam for T-LAN was to remain property of T-LAN. Interim Support's membership consisted of LAN's directors, former director James Schilling ("Schilling") and CEO Michael Guirlinger ("Guirlinger").

{¶ 10} Panos told appellees that they did not have a choice: Schmidt was to take over as CEO of the remaining business, later renamed iB3. iB3 essentially was iBeam remade into a public company, still with revenues only of a regional IT company, and still saddled with debt to its original principals and others. Otherwise, Panos would "shut it all down" and bankrupt the company. (Tr. Vol. II, 86.) Panos persuaded Schmidt that if Schmidt agreed, Panos would secure the necessary funding to pay off iB3's debt, and thereby, appellees' debt, as with the unfulfilled promise related to the merger, within 90 days. Panos represented that he would make the company successful, all at which time Schmidt could step down as CEO. Panos told him not to go to LAN's CEO Guirlinger or its board of directors; Panos would deal with them. Schmidt nevertheless approached Guirlinger, who said he could not talk about the spin off, and that there was a fight between the brothers.

{¶ 11} At a board meeting on December 21, 2007, Panos presented his plan to spin off the medical interpretation business into a separate company. According to the minutes, Panos represented to the board that he personally would assume some company debts and indemnify the board of directors against any personal liability. At trial, Panos tried to disclaim any such undertaking on his part: "I meant the parent company would take on some of the debt and the spinoff would take the majority of the debt." (Tr. Vol. IV, 334.) The only debt he would assume, in retrospect, was the debt owed to him. Likewise, Panos maintained that only LAN/iB3 would be responsible for iBeam's debts, despite his prior representations to the Schmidts. Though he acknowledged his conversations with the Schmidts and their overwhelming concerns with iBeam's debt, which had motivated them to seek a buyer and ultimately agree to the merger with LAN,

Panos stated at trial that he did not know the details of iBeam's debt until he saw the merger agreement.

{¶ 12} At the same December 21, 2007 meeting, the chairman of LAN's board of directors announced that one or more shareholders were selling off 200,000 to 300,000 shares of LAN stock, driving the stock price down to $0.13 per share. Panos had not disclosed that he was directly involved in dumping the stock and the resultant driving down of the price per share.  From June 1, 2007 to November 23, 2007, during and including the period of merger negotiation and closing, Panos had entered into four stock sale agreements with another entity, Golden Gate Investors ("Golden Gate"):  Panos would sell to Golden Gate a total of 1,625,000 shares of LAN stock over that period of time, for approximately $750,000. Later, it emerged that Golden Gate had sold 100,000 shares of LAN stock around the time of the December 21, 2007 meeting, at $.13 per share. According to Schmidt, if Panos had disclosed any of this information, appellees would not have agreed to the plan.

{¶ 13} On January 22, 2008 Panos asked the board of directors to put Schmidt in charge, for LAN's medical interpretation business to be spun off, and for the board members to resign. They complied. LAN's business, through T-LAN, was spun off to Interim Support consisting of LAN's directors, former director Schilling and CEO Guirlinger, leaving only iBeam's business with LAN. For LAN post-spinoff, Panos brought in only a small investment in the 90 days following the spinoff. Post-spinoff, Panos controlled all of the money and made all of the contacts for potential funding and acquisitions for iB3.  Schmidt told Panos several times that he was uncomfortable serving as CEO of a public company, but Panos replied that he would advise Schmidt on the "public side of things" and that Schmidt had to remain CEO and that the funding would come in and the debts would be paid. (Tr. Vol. V, 718.)  Panos repeatedly claimed that he was bringing in funding. However, he turned away potential investors and declined opportunities without Schmidt's input. Panos also sent rejection letters to potential investors with what was represented to be Schmidt's signature but without Schmidt's consent.  Panos also would not raise the cash for iB3 to take advantage of opportunities with another entity, Central Oregon Wireless and Gatestone Group.

{¶ 14} Panos said that Schmidt had no choice but to "stick in there" as CEO, that funding would be obtained and that debts would be paid and the company turned around. (Tr. Vol. II, 88.)   Until November 2009, the company's creditors were paid, but the company remained undercapitalized; the Schmidts deferred salary to help keep the company alive.

{¶ 15} Panos used LAN/iB3 assets to do work for other companies Panos was taking public, and for his personal use unrelated to the company. Panos admitted that he paid lawyers, accountants and other service providers with his own funds. In other instances, he personally worked on press releases and with stock transfer agents, and paid them through Panos Industries or with cash. When he paid for outside services or otherwise put his money into the company, he sometimes took a note from the company. Sometimes he did not tell the company about the payments he made. He used the company's iMailer software for his own purposes unrelated to LAN/iB3's business. Panos was placed on LAN/iB3's payroll so that he could receive health insurance under the company's group health insurance policy.

{¶ 16} Panos caused the company to issue a private placement memorandum to raise 3 million dollars, but he approached only friends and family, bringing in just $5,300. In June 2009, Panos personally sold at least 191,364 shares of iB3 for $193,277. iB3 shares held by Panos' personal assistant, Arthur Kaplan, worth more than $400,000, were delivered to Panos' New Albany home in order for him to sell them.

{¶ 17} After he sold these shares, Panos refused to support iB3's operations further.  In September 2009, he ordered a "research report" and related press release indicating a "buy" rating for iB3 that projected an increased share price for posting,  on the Grass Roots Research website, without Schmidt's approval. (Plaintiff's Exhibit, 66.) Just days earlier, Panos had told Schmidt that Panos was done with iB3 and wanted Schmidt to "buy back" iBeam. (Tr. Vol. II, 120.)  Schmidt could not afford it.

{¶ 18} Schmidt had the research report and press release removed from iB3's website.   Panos' attorneys sent Schmidt a letter stating that Panos had "the ability to remove the existing Board of Directors and management team, liquidate any assets [of the company], while issuing a lawsuit against [Schmidt] personally." (Tr. Vol. II, 124.)  Panos threatened to take this action with or without Schmidt's cooperation, unless Schmidt

essentially bought back iBeam and assumed all of the iBeam and iB3 debts, including the IRS liabilities.

{¶ 19} Schmidt offered a counterproposal.   Panos arranged a shareholders' meeting to appoint a new board under his control. At the meeting, Schmidt announced his resignation.  After the meeting, Panos offered to sell what essentially remained of iBeam back to Schmidt for $50,000 "plus [Schmidt] taking the debts back plus a lot of other items", as Schmidt related. (Tr. Vol. II, 140.) Schmidt still could not afford it.  According to Schmidt, Panos said, "I'm going to basically bankrupt the company and screw everyone." (Tr. Vol. II, 141.)  Within an hour Panos' attorneys e-mailed Schmidt a letter terminating his and his wife, Brenda's employment with iB3.  Apparently taking this letter as a rejection of his resignation as CEO of iB3, Schmidt responded that his employment was being terminated without thirty days' notice, in violation of the employment agreement. Panos continued to effectively maintain control of iB3 as a public "shell" company, whether or not Schmidt accepted Panos' offer to buy back what was essentially the remainder of iBeam.

{¶ 20} Panos filed a lawsuit against the Schmidts but dismissed it after the complaint in this case was filed.  Appellees brought suit against Interim Support and its members, including the pre-spinoff LAN/iB3's board of directors.   In that matter, Brenda Schmidt's and Bursey's claims were dismissed, while Schmidt obtained a $75,000 settlement. The trial of appellees' claims against Panos and Panos Industries, under review in this appeal, commenced initially on August 27, 2012.  In his opening statement, counsel for appellees highlighted for the jury Panos' dealings with Golden Gate, at which appellants' attorney expressed surprise, since this area had not been mentioned in the pleadings or pretrial discovery.  At this early stage of trial, the trial judge declared a mistrial, and ordered appellees to file an amended complaint to include the specific allegations of the stock transactions with Golden Gate.  After appellees filed their amended complaint, now designating all three of them as plaintiffs and Panos, Panos Industries and iB3 as defendants, the trial court denied Panos' and Panos Industries' request to amend the case schedule to permit additional time for discovery and extend the pretrial and trial dates.

{¶ 21} The trial occurred and was brought to conclusion between May 20, 2013 and May 29, 2013.  At trial, Panos sought to pin fault on Schmidt for iB3's failure to thrive.  Panos urged, "It seemed that every time I turned around [Schmidt] was short or Eric couldn't make his payroll or [Schmidt] couldn't make a payment. It seems [Schmidt]'s only successful business plan was calling me up and asking for money, and that gets old." (Tr. Vol. V, 717-18.)  He insisted that the spinoff was for appellees' benefit:

> I felt that this would be a win for [Schmidt] and for iBeam, and I felt that it would be a win for the company. The only other choice if it was not a win was me closing down on those notes and saying: It's done, I'm forcing the company into bankruptcy based on my notes, just like the bank would foreclose on your house, and we would look at these assets and I would take the pennies on the dollar and walk away.

(Tr. Vol. V, 723.)

{¶ 22} Appellees pressed their claims that Panos never intended to provide adequate funding for iB3 and to cover its (and their) debts.  Their claims for indemnification, breach of contract, breach of fiduciary duty, fraud, negligent misrepresentation, promissory estoppel and unjust enrichment were submitted to the jury, which returned verdicts in favor of appellees on all claims except promissory estoppel.  Appellees also were permitted to pierce the corporate veil of iB3 to hold Panos liable for the acts of the company. The jury found that Panos exercised complete control over iB3 in order to commit fraud, an illegal act, or a similarly unlawful act.

## II.   Assignments of Error

{¶ 23} In their eight assignments of error appellants argue that the trial court:

> (1) [E]rred in denying Appellants' motion for judgment notwithstanding the verdict and motion for directed verdict because Appellees lack individual standing under clearly established Ohio law to bring corporate claims;
>
> (2) [E]rred in denying Appellants' motion for judgment notwithstanding the verdict and motion for directed verdict because, even if Appellees had standing to individually assert corporate claims, such claims fail as a matter of law;
>
> (3) [E]rred in denying Appellants' motion for judgment notwithstanding the verdict and motion for directed verdict on Appellees' claims for breach of contract and indemnification because these claims are barred by the

Statute of Frauds and Appellees provided no consideration for Mr. Panos's alleged promise to pay iBeam's debts;

(4) [E]rred in denying Appellants' motion for judgment notwithstanding the verdict and motion for directed verdict on the fraud claim because any alleged promise made by Mr. Panos was premised on inactionable promises of future conduct, and Appellees could not reasonably rely on such promises;

(5) [E]rred in denying Appellants' motion for judgment notwithstanding the verdict and motion for directed verdict on the unjust enrichment claim because the existence of a fully-integrated agreement and [A]ppellees' unclean hands preclude equitable relief, and Appellees failed to show Mr. Panos was unjustly enriched;

(6) [A]bused its discretion when it denied Appellants' motion for a new trial due to inconsistencies between the jury interrogatories and inconsistencies between the interrogatories and general verdicts;

(7) [A]bused its discretion when it denied Appellants' motion for new trial based on juror misconduct and the trial court refused to conduct a hearing to determine the full extent and effect of the misconduct; and

(8) [A]bused its discretion when it denied Appellants' January 25, 2013 motion to modify case schedule.

## III. Discussion

{¶ 24} Regarding assignments of error 1-5: "As motions for directed verdict and judgment notwithstanding the verdict present a question of law, an appellate court applies the de novo standard of review." *Hale v. Spitzer Dodge, Inc.,* 10th Dist. No. 04AP-1379, 2006-Ohio-3309, ¶ 15. "The standard for granting a motion for judgment notwithstanding the verdict or in the alternative for a new trial pursuant to Civ.R. 50(B) is the same as that for granting a motion for a directed verdict pursuant to Civ.R. 50(A)." *Texler v. D.O. Summers Cleaners & Shirt Laundry Co.,* 81 Ohio St.3d 677, 679 (1998).

When a motion for a directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the

court shall sustain the motion and direct a verdict for the moving party as to that issue.

Civ.R. 50(A)(4). Moreover:

> [I]t is well established that the court must neither consider the weight of the evidence nor the credibility of the witnesses in disposing of a directed verdict motion. *Durham v. Warner Elevator Mfg. Co.* (1956), 166 Ohio St. 31. Thus, "if there is substantial competent evidence to support the party against whom the motion is made, upon which evidence reasonable minds might reach different conclusions, the motion must be denied. *Kellerman v. J. S. Durig Co.* (1964), 176 Ohio St. 320, 199 * * *." Hawkins v. Ivy (1977), 50 Ohio St.2d 114, 115.

*Strother v. Hutchinson*, 67 Ohio St.2d 282, 284-85 (1981).  In addition:

> When a motion for a directed verdict is entered, what is being tested is a question of law; that is, the legal sufficiency of the evidence to take the case to the jury. This does not involve weighing the evidence or trying the credibility of witnesses; it is in the nature of a demurrer to the evidence and assumes the truth of the evidence supporting the facts essential to the claim of the party against whom the motion is directed, and gives to that party the benefit of all reasonable inferences from that evidence. The evidence is granted its most favorable interpretation and is considered as establishing every material fact it tends to prove. The "reasonable minds" test of Civ.R. 50(A)(4) calls upon the court only to determine whether there exists any evidence of substantial probative value in support of that party's claim.

*Ruta v. Breckenridge-Remy Co.*, 69 Ohio St.2d 66, 68-69 (1982).

{¶ 25} We review the other matters raised by appellants for abuse of discretion. *Weinstock v. McQuillen,* 10th Dist. No. 09AP–539, 2010-Ohio-1071, ¶ 10 (new trial); *State ex rel. Denton v. Bedinghaus,* 98 Ohio St.3d 298, 2003-Ohio-861, ¶ 31 (discovery matters).

### A. Standing

{¶ 26} Appellants first contend that the Schmidts and Bursey lack standing to bring their claims, insofar as "only a corporation and not its shareholders can complain of an injury sustained by, or a wrong done to, the corporation." *Adair v. Wozniak,* 23 Ohio St.3d 174, 176 (1986).

> However, this general principle has no application where the wrongful acts are not only against the corporation but are also

> violations of a duty arising from contract or otherwise owed directly by the wrongdoer to the shareholder. A suit brought by a shareholder on a personal claim is distinguishable from a proceeding to recover damages or other relief for the corporation.

*Id.* Appellees convinced the jury that Panos breached contractual and fiduciary duties directly to them, and independently of their status as shareholders in LAN/iB3. In addition, their injuries were distinct from those of other shareholders and included their lost personal salaries, building rent and outstanding company debts for which they had assumed responsibility. These are not post-transaction injuries that arose solely because they were shareholders of a publicly-traded company. They are not the same injuries any shareholder would have suffered. The cause of action is individual and not derivative where "(1) where there is a special duty between the wrongdoer and shareholder, and (2) where the shareholder suffered an injury separate and distinct from that suffered by other shareholders. 12(B) Fletcher Cyclopedia of the Law of Private Corporations (1984) 421, Section 4911." *Reim v. Swanson*, 8th Dist. No. 79006 (Aug. 30, 2001).

{¶ 27} We also reject appellants' argument that Brenda Schmidt and Bursey were improperly joined as third-party plaintiffs. Although they were named in the third-party complaint without having been impleaded as defendants, appellants raised no objection until five days before trial commenced for the second time on May 20, 2013. In a joint motion filed August 30, 2012, after the mistrial, they had consented to the filing of an amended complaint on behalf of all three appellees. We agree with the trial court that Brenda Schmidt and Bursey were properly joined, without objection, by the filing of the amended complaint. There was no need to resort to Civ.R. 24 intervention as appellants insist. Appellants' written consent in the joint motion permitted the amendment under Civ.R. 15(A). Conducting discovery and other pretrial matters as to all three appellees, appellants further evinced their waiver of objections to joinder of Brenda Schmidt and Bursey. Permitting the amendment was within the sound discretion of the trial court. *Townsend v. Ohio Dept. of Transp.,* 10th Dist. No. 11AP-672, 2012-Ohio-2945, ¶34. *See Bill Gates Custom Towing, Inc. v. Branch Motor Express Co.,* 1 Ohio App.3d 149, 150 (10th Dist.1981) ("addition of the two new parties as plaintiffs would not present any significant prejudicial factors against the defendants or create any undue delay or other problem in the conduct of the trial").

{¶ 28} Also, Civ.R. 21 provides:

> Misjoinder of parties is not ground for dismissal of an action. Parties may be dropped or added by order of the court on motion of any party or of its own initiative at any stage of the action and on such terms as are just. Any claim against a party may be severed and proceeded with separately.

Since appellants defended the matter in all respects as though Brenda Schmidt and Bursey were party plaintiff up to the eve of trial, the trial court could have deemed them duly impleaded, even without appellants' consent to the amended complaint, consistent with the purpose of Civ.R. 21:

> "[T]o permit the bringing in of a person who, through inadvertence, mistake or for some other reason, * * * [has] not been made a party [originally] and whose presence * * * is * * * necessary or desirable * * *. " *Crews v. Blake* (S.D.Ga.1971), 52 F.R.D. 106, 107 [quoting *Truncale v. Universal Pictures Co.,* 82 F.Supp. 576, 578 (S.D.N.Y. 1949)].

*Bill Gates Custom Towing* at 150. The first assignment of error is overruled.

## B. Breach of Fiduciary Duty

{¶ 29} In the second assignment of error, appellants argue that as a shareholder of LAN and iB3, and not formally an officer or director, Panos could have no fiduciary duty to appellees. Appellees, however, did not rely on Panos' status as shareholder to support their claims of a legal duty and its breach. Rather, Panos' representations and enticements to produce the merger—that he would fund the company and see that appellees' debts were paid—formed the basis for the fiduciary relationship alleged.

> "A 'fiduciary relationship' is one in which special confidence and trust is reposed in the integrity and fidelity of another and there is a resulting position of superiority or influence, acquired by virtue of this special trust." *In re Termination of Employment* (1974), 40 Ohio St.2d 107, 115, 321. A fiduciary relationship need not be created by contract; it may arise out of an informal relationship where both parties understand that a special trust or confidence has been reposed.

*Stone v. Davis,* 66 Ohio St.2d 74, 78 (1981), citing *Umbaugh Pole Bldg. Co. v. Scott,* 58 Ohio St.2d 282, 286 (1979). The jury heard evidence of acts by Panos that extended beyond those of a mere shareholder in a public corporation. Nothing prevented him from undertaking a fiduciary duty on account of his representations, even though he was not formally a corporate officer or director, or to the extent that he exercised dominance as

majority shareholder or potential majority shareholder at such time as he chose to convert the company's debt to him into stock. Thus, Panos was able to force the spinoff:

> Q. You were the majority creditor. You had the power to convert stock to be the vast majority shareholder, correct?
>
> A.  At that time, yes.
>
> Q. So you had control over the company?
>
> A. I had the ability to vote my shares in my position.
>
> Q. You had the ability to force the spinoff, correct?
>
> A. Correct.
>
> Q. So you being a five percent shareholder we have heard your attorneys talk about, that didn't matter, you were in control, correct?
>
> A. It's just like the bank and having a mortgage on your house.
>
> Q. You were in control, correct?
>
> A. If I would have converted that, yes.
>
> Q. You did convert stock so you could vote for the spinoff correct?
>
> A. I don't remember.
>
> Q. You voted for the spinoff, the spinoff occurred?
>
> A.  I voted for the spinoff, yes.

(Tr. Vol. IV, 345-46.)  Likewise, he had the voting power ultimately to force the board to amend the bylaws, oust the appellees, replace them with directors under his control, and bankrupt the company:

> Q. To tell the board of directors to screw everyone else and then tell your attorneys to sue my clients on behalf of the company with a baseless lawsuit, was that your role?
>
> A.  That is the direction I would vote in, yes.

(Tr. Vol. V, 774.)

{¶ 30} That there is "a heightened fiduciary duty between majority and minority shareholders in a close corporation", *Crosby v. Beam,* 47 Ohio St.3d 105, 108 (1989), is well-settled.  This does not mean that a shareholder can never enter into a fiduciary relationship with other shareholders in a public corporation.  Moreover, appellees have a direct cause of action against the corporation insofar as they were " 'injured in some way separate and distinct from any injury to the corporation.' " *Kadel v. Dayton Superior*

*Corp.,* 105 Ohio Misc.2d 11, 15 (C.P.2000), quoting *Gensemer v. Hallock,* 125 Ohio App.3d 84, 91 (9th Dist.1997).   As we discussed in relation to appellant's standing arguments, appellees pleaded and proved that they suffered injuries different from those of other shareholders.  The damages awarded were not specifically for decline in the stock price. Nor did LAN/iB3's status as a public corporation negate any fiduciary duty undertaken by Panos or immunize him from the consequences of breach.  Panos devised ways to exert such overwhelming control over LAN/iB3 to give rise to a fiduciary duty by his actions.

{¶ 31} As for majority shareholders in a close corporation, "utilizing their majority control of the corporation to their own advantage, without providing minority shareholders with an equal opportunity to benefit, * * * absent any legitimate business purpose," is an actionable breach of that duty.  *Crosby* at paragraph 2 of the syllabus. Claims against majority shareholders, who "use their control to deprive minority shareholders of the benefits of their investment, may be brought as individual or direct actions".  *Id.* at paragraph 3 of the syllabus. "When a controlling shareholder exercises that control to derive a personal benefit not available to those shareholders out of power, the controlling shareholder has breached his heightened fiduciary duty." *McLaughlin v. Beeghly,* 84 Ohio App.3d 502, 506 (10th Dist.1992).

{¶ 32} Appellants maintain that Panos was free to sell his shares in LAN/iB3 as he wished.  Whether or not Panos could dispose of his shares or decide to quit funding the company under normal circumstances, appellees could show that the fiduciary relationship compelled more circumspect conduct.  As he was attempting to acquire iBeam for LAN, Panos was selling hundreds of thousands of shares in his side deal with Golden Gate, as he asserted at trial, to avoid the open market and still raise cash.  The evidence permitted the jury to accept that Panos had concealed these stock sale agreements from appellees and the LAN board of directors, and to conclude that this conduct was not in keeping with the fiduciary duty the jury specifically found to have arisen from Panos' dealings with appellees.   The evidence further warranted the conclusion that this side deal caused the share price to plummet and ruin the company's chances to attract other significant outside investment.  Schmidt was clear, that if he had

known about the side deal, he would not have agreed to stay with the company through the spinoff and take over as CEO.

{¶ 33} The law is zealous in guarding against abuse in a fiduciary-principal relationship. *In re Termination of Employment,* 40 Ohio St.2d 107, 115 (1974). As we stated in *Saxe v. Dlusky,* 10th Dist. No. 09AP-673, 2010-Ohio-5323:

> The duty is one of "utmost good faith and loyalty." *DiPasquale v. Costas,* 186 Ohio App.3d 121, 926 N.E.2d 682, 2010-Ohio-832, ¶ 133, quoting *Crosby* [*v. Beam,* 47 Ohio St.3d 105, 108 (1989)].
>
> "A party involved in a business transaction with another with whom he is in a fiduciary relationship is bound to make full disclosure of material facts known to him but not to the other." *Isroff v. The Westhall Co.* (Nov. 27, 1991), 9th Dist. No. 15063 (*Isroff II*), quoting *Blon v. Bank One, Akron, N.A.* (1988), 35 Ohio St.3d 98, 101, 519 N.E.2d 363; *Binsack v. Hipp* (June 5, 1998), 6th Dist. No. H-97-029. "The common-law fiduciary duty to disclose is not boundless." *Isroff II.* "[I]t is generally held that the duty to disclose is limited to present, material information that would reasonably affect the complainant's decision to enter the transaction[.]" *Isroff v. The Westhall Co.* (Feb. 21, 1990), 9th Dist. No. 14184 (*Isroff I*).

*Id.* at ¶ 26-27. There was ample evidence for the jury to determine that Panos' failure to disclose the side deal and his unwillingness to provide funding for the company, among other factors, and his determination in the end to destroy the company and "screw everyone else" amounted to breach of fiduciary duty to appellees. (Tr. Vol. II, 141.)

### C. Piercing the Corporate Veil

{¶ 34} Appellants attempt a similarly categorical legal argument in regard to the jury's conclusion that Panos exercised such complete control over iB3 to commit fraud or other unlawful conduct, as to render him liable for acts of the corporation. Appellants assert that it is "legally impossible" to pierce the veil of a public corporation and impose liability on an individual shareholder. Piercing the corporate veil of a public corporation is rare and unlikely, but not impossible. Such is the import of the footnote in *Stypula v. Chandler,* 11th Dist. No. 2002-G-2468, 2003-Ohio-6413, on which appellants heavily rely:

> "[R]equiring control screens out piercing against the shareholders of a publicly traded corporation, who, as a

> practical matter, do not exercise control. This provides a doctrinal underpinning to explain the fact that there has never been a case in which the court pierced to hold shareholders in a public corporation liable for the company's debts."

*Id.* at ¶ 23, fn. 2, quoting Gevurtz, *Piercing Piercing: An Attempt to Lift the Veil of Confusion Surrounding the Doctrine of Piercing the Corporate Veil,* 76 Ore.L.Rev. 853, 865-66 (1997). The basis for the statement is an empirical study,[1] not a legal rule. As a practical matter, appellees adduced and the jury assented that although the company's shares could be traded publicly, Panos managed to exercise dominion and control over LAN/iB3 to commit fraud and other illegal acts against appellees.

{¶ 35} Appellants similarly misplace their reliance on another scholarly statement, also empirically based, that "[s]hareholders of public corporations are effectively immune from veil piercing claims." Bainbridge, *Abolishing Veil Piercing,* 26 J.Corp.L. 479, 482 (2001),[2] quoted in *McKesson HBOC, Inc. v. New York State Common Retirement Fund Inc.,* 339 F.3d 1087, 1094 (9th Cir.2003) (applying Delaware law). Ultimately Professor Bainbridge advocates for a regime of liability which focuses on appropriate questions "such as: Did the defendant-shareholder do anything for which he or she should be held directly liable? Did the shareholder commit fraud, which led a creditor to forego contractual protections? Did the shareholder use fraudulent transfers or insider preferences to siphon funds out of the corporation?" Bainbridge at 535. Such inquiries regarding Panos' conduct effectively were before the jury in this case.

{¶ 36} Furthermore, the opinion in *McKesson* recognized potential shareholder liability. In that case there was no allegation that the shareholders exercised or even had the ability to exercise domination or control, or that they manipulated HBOC in that case to commit fraud, and so the Ninth Circuit Court of Appeals declined "to invoke the extraordinary remedy of disregarding the corporate form to reach the shareholders of a public company." *McKesson* at 1095. Two cases are distinguishable in which claimants were able to pursue shareholder liability.

---

[1] Thompson, *Piercing the Corporate Veil: An Empirical Study*, 76 Cornell L.Rev. 1036, 1047 (1991).
[2] The omitted footnote cites Thompson, *The Limits of Liability in the New Limited Liability Entities,* 32 Wake Forest L.Rev. 1, 9 (1997) ("Piercing occurs only within corporate groups or in close corporations with fewer than 10 shareholders").

{¶ 37} In *AFP Imaging v. Ross,* 780 F.2d 202 (2d Cir.1985), *cert. denied,* 478 U.S. 1004 (1986), the 29 shareholders of Xenon Industries, Inc. sold stock under the name of the corporation, which could not unilaterally effect the sale of its own stock. The Second Circuit Court of Appeals held that a jury might conclude that Xenon was acting in a representative capacity for the shareholders. "If, in fact, Xenon was acting as appellees' agent in making what AFP alleges to be false warranties and representations, appellees, having accepted the benefits with knowledge of the inducements, will be hard put to disassociate themselves from Xenon's allegedly wrongful acts." *Id.* at 204. Consistent with the evidence that Panos exercised such extraordinary control to give rise to a fiduciary duty, he could be liable also as a shareholder who involved the corporation in his own business affairs "to such an extent as to constitute it [his] agent." *Id.*

{¶ 38} In *Reinfeld v. Riklis,* 722 F.Supp. 1077 (S.D.N.Y.1989), SCH Corporation ("SCH") effected a merger with Reinfeld Corporation. After Reinfeld sued SCH, SCH counterclaimed against Reinfeld and its shareholders for knowingly inflating Reinfeld's net worth. *Id.* at 1079-80. Reinfeld's 56 shareholders gave written approval for execution of the agreement. SCH was allowed to pursue federal securities and common law fraud claims against the shareholders inasmuch as they involved the corporation in their own affairs and thereby used the corporation as their agent. *Id.* at 1085.

{¶ 39} In *McKesson* the Ninth Circuit Court of Appeals found *AFP* and *Reinfeld* to be consistent with the circumstances in which Delaware law countenances veil piercing. *McKesson* at 1095. *See also Birbara v. Locke,* 99 F.3d 1233, 1238 (1st Cir.1996) (assuming dubitante "that Massachusetts would apply the same standards in deciding whether to pierce the corporate veil when the defendant is a public corporation as it has when the defendant is a close corporation"); *In re Telectronics Pacing Sys., Inc.,* 953 F.Supp. 909, 915 (S.D.Ohio 1997) (discussing veil piercing in analysis of personal jurisdiction over non-resident shareholders of publicly traded company).

{¶ 40} Under Ohio law:

> The corporate form may be disregarded and individual shareholders held liable for wrongs committed by the corporation when (1) control over the corporation by those to be held liable was so complete that the corporation has no separate mind, will, or existence of its own, (2) control over the corporation by those to be held liable was exercised in

> such a manner as to commit fraud or an illegal act against the person seeking to disregard the corporate entity, and (3) injury or unjust loss resulted to the plaintiff from such control and wrong.

*Belvedere Condominium Unit Owners' Assn. v. R.E. Roark Cos., Inc.*, 67 Ohio St.3d 274 (1993), paragraph three of the syllabus. "To fulfill the second prong of the *Belvedere* test for piercing the corporate veil, the plaintiff must demonstrate that the defendant shareholder exercised control over the corporation in such a manner as to commit fraud, an illegal act, or a similarly unlawful act."  *Dombroski v. WellPoint, Inc.,* 119 Ohio St.3d 506, 2008-Ohio-4827, syllabus and ¶ 29.

{¶ 41} To set aside the verdict, appellants do not argue there were no facts in evidence to support any element of the claim, but rather that the corporate veil never can be pierced to hold a shareholder of a public company liable for its debts.  Appellants can point to no grounds to depart from the *Belvedere* test (as modified by *Dombroski*) in the case of a public company and avoid liability for corporate debts in cases where "shareholders used their complete control over the corporate form to commit specific egregious acts".  *Dombroski* at ¶ 27.[3]  On the claims of breach of fiduciary duty and breach of contract, the jury held iB3 liable to appellees for their back salary and unpaid building rent.  Appellants have not shown that the merger agreement and its integration clause operate to foreclose these economic damages.

{¶ 42} Appellees introduced evidence of substantive probative value that Panos exercised complete control over LAN/iB3 and used that control to defraud appellees with representations that their debts would be paid, while failing to disclose his sale of hundreds of thousands of shares through his side deals with Golden Gate.  While the decline in stock price was not an element of appellees' damages, this was evidence of Panos' manipulation which precipitated the downfall of the company and defeated efforts at investment. The issues of his liability for breach of fiduciary duty, and on account of his abuse of the corporate form, were properly submitted for the jury's consideration, and we will not disturb those verdicts against him.  The second assignment of error is overruled.

---

[3] The observation in *Dombroski* that if piecing were not so limited,"[c]ontrolling shareholders in publicly traded corporations could also be subject to frequent piercing, regardless of the corporation's liability and its ability to pay for the plaintiff's injuries", would be pointless if piecing the corporate veil of a public company were legally foreclosed in all cases, regardless of the shareholder's control and conduct. *Id.* at ¶ 27.

### D. Indemnification and Breach of Contract

{¶ 43} Appellants contest the verdict on the claims of indemnification and breach of contract on the ground that they are barred by the statute of frauds, R.C. 1335.05, which provides in pertinent part:

> No action shall be brought whereby to charge the defendant, upon a special promise, to answer for the debt, default, or miscarriage of another person * * * unless the agreement upon which such action is brought, or some memorandum or note thereof, is in writing and signed by the party to be charged therewith or some other person thereunto by him or her lawfully authorized.

The statute, however, applies only to promises made to a creditor and not, as here, where the promise to answer for the debt is made to the debtor himself. *Knapke v. J. C. Penney Co., Inc.,* 3d Dist. No. 10-92-8 (July 31, 1992); *Modarelli v. Morris*, 7th Dist. No. 90 C.A. 91 (Aug. 13, 1991); 72 American Jurisprudence 2d, Statute of Frauds, Section 209, at 737-38 (1974); 51 Ohio Jurisprudence 3d, Statute of Frauds, Section 10, at 176-77 (1984). Because the promises Panos made were to appellees themselves and not their creditors, the statute of frauds is inapplicable.

{¶ 44} Contrary to appellants' further contentions, there was no lack of consideration for Panos' promise to pay appellees' debts.

> Consideration may consist of either a detriment to the promisee or a benefit to the promisor. *Software Clearing House, Inc. v. Intrak, Inc.* (1990), 66 Ohio App.3d 163, 583 N.E.2d 1056. A benefit may consist of some right, interest or profit accruing to the promisor, while a detriment may consist of some forbearance, loss or responsibility given, suffered or undertaken by the promisee. 17 Ohio Jurisprudence 3d (1980) 488–489, Contracts, Section 56. Absent a showing of fraud, consideration is not deemed legally insufficient merely because it is inadequate. *Mooney v. Green* (1982), 4 Ohio App.3d 175, 4 OBR 276, 446 N.E.2d 1135.

*Brads v. First Baptist Church,* 89 Ohio App.3d 328, 336, (2d Dist.1993). "The consideration may be given to the promisor or a third person or may be given by the promisee or a third person.*" Coldwell Banker Residential Real Estate Servs., Inc. v. Bishop,* 26 Ohio App.3d 149, 151 (1st Dist.1985).

{¶ 45} Upon Panos' promises, appellees commenced with the IRS payroll tax payment plan, agreed to the acquisition of their business and to become employed by

LAN, and stayed with the company despite the spin-off of its core medical interpretation business a few months later.  There was consideration to support a contract by Panos to pay the debts appellees had incurred to keep iBeam in business.  The third assignment of error is overruled.

### E.  Fraud

{¶ 46} Appellants urge that there could be no issue for the jury on the fraud claim against Panos because "a claim of fraud cannot be predicated upon promises or representations relating to future actions or conduct." *Martin v. Ohio State Univ. Found.,* 139 Ohio App.3d 89, 98 (10th Dist.2000).  "An exception to this rule exists, however, where an individual makes a promise concerning a future action, occurrence, or conduct and, at the time he makes it, has no intention of keeping the promise." *Williams v. Edwards,* 129 Ohio App.3d 116, 124 (1st Dist.1998).  Panos could be held liable for fraud based on evidence that he had no intention to perform when he made his promises and representations.  "[A] promise made with a present intention not to perform it is a misrepresentation of an existing fact–the speaker's present state of mind."  *Link v. Leadworks Corp.,* 79 Ohio App.3d 735, 742 (8th Dist.1992).

> The applicable rule of law is well set forth in 37 American Jurisprudence 2d (1968) 613, Fraud and Deceit, Section 447, as follows:
>
> " * * * [A] fraudulent intent not to perform a promise cannot be inferred merely from the fact of nonperformance, although that fact may, when coupled with evidence of other pertinent circumstances, support an inference of lack of intent to perform at the time the promise was made. * * * If a promisor had no reasonable ground to anticipate that his undertaking might be carried out, it seems that this fact may establish a prima facie case that the promise was not made in good faith. An intention not to perform may be inferred from the fact that, after performance by the promisee, the promisor does not even make a pretense of carrying out his promise, or evades and refuses to perform it."

*Gelzer Sys. Co., Inc. v. Indus. Mach. & Supply Co.,* 10th Dist. No. 84AP-1156 (Feb. 20, 1986).

{¶ 47} Panos did fail to pay appellees' debts, and there was additional proof that he concealed LAN's untenable financial position along with his stock sale agreements with Golden Gate, withheld promised funding and thwarted investment opportunities for iB3,

and finally demanded that appellees buy back the company and take back the debt he had agreed to pay. From this evidence the jury could infer that he had no intention to perform and thus misrepresented his mental state while he verbally represented LAN's viability, the purpose of the iBeam acquisition, and that appellees' debts would be paid. "In such a case, the individual possesses actual fraudulent intent and a claim for fraud may be asserted against him." *Williams* at 124.

{¶ 48} Nor did the August 1, 2007 agreement and plan of merger, with its integration clause, negate the element of reasonable reliance. The fraud claim was levelled against Panos individually. Appellants took pains at trial to show that Panos personally was not a party to the agreement, and his name does not appear in it. The agreement, its integration clause, and the parol evidence rule do not affect the fraud claim against him. *See Bowman v. Tax Comm. of Ohio,* 135 Ohio St. 295, 300-01 (1939) ("While parol evidence may not be received to contradict or vary the terms of a written instrument as between the parties thereto and their privies, such evidence is admissible when otherwise competent in controversies between strangers to the instrument, or between a stranger and a party thereto"). Accordingly, we overrule the fourth assignment of error.

### F. Unjust Enrichment

{¶ 49} For the same reason, the integration clause does not bar the unjust enrichment claim against Panos. To support this claim, appellees adduced evidence of his side deal with Golden Gate, and that in 2009 he disposed of his and his personal assistant's shares for substantial sums while the company was in sharp decline. He used company assets for other projects and was placed on the payroll to obtain health insurance through iB3—all extraordinary benefits for someone acknowledging no responsibility beyond that of a mere shareholder in a public company. From the evidence the jury could conclude that he exercised his control to induce iBeam's merger with LAN, only to spin off LAN's business a few months later, and ultimately to force out the appellees in order to end up with a public shell corporation available for sale or merger, and which Panos claimed to be worth $500,000-$1,000,000.

{¶ 50} Accordingly, there was evidence to support appellees' claim for unjust enrichment: (1) a benefit conferred by a plaintiff upon a defendant, (2) knowledge by the

defendant of the benefits, and (3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment. *Hambleton v. R.G. Barry Corp.,* 12 Ohio St.3d 179, 183 (1984); *Alice's Home v. Childcraft Edn. Corp.,* 10th Dist. No. 09AP-299, 2010-Ohio-4121, ¶ 20.  Appellants' further argument that Schmidt lacked clean hands, because he prepared iB3's 8K statements to the Securities Exchange Commission ("SEC") and included no reference to guarantees of his or iB3's debt, lacks merit.  "[I]n order for the [clean hands] doctrine to bar a party's claims, the party must be found to be at fault in relation to the other party and in relation to the transaction upon which the claims are based." *Trott v. Trott,* 10th Dist. No. 01AP-852 (March 14, 2002). The SEC statements did not implicate any fault of Schmidt in relation to Panos.  The fifth assignment of error is overruled.

### G. Consistency of Answers to Jury Interrogatories

{¶ 51} Finding in favor of appellants on the claim of promissory estoppel, the jury answered in the negative to the special interrogatory: "Did Edward Panos/Panos Industries, LLC/iB3 Networks, Inc. make a clear, definite promise to Eric Schmidt/Brenda Schmidt/Paul Bursey?" (Jury Interrogatories for Promissory Estoppel, 19.)  Promissory estoppel requires a promise to be "clear and definite in its terms." *County Sav. Bank v. Sain,* 10th Dist. No. 91AP-380 (Apr. 21, 1992).  *See Villagran v. Cent. Ohio Business Servs., Inc.,* 10th Dist. No. 94APE08-1267 (June 8, 1995) (plaintiff must demonstrate "a promise, clear and unambiguous in its terms"); *In re Campbell,* 159 F.3d 963, 968 (6th Cir.1998), quoting *State Bank of Standish v. Curry,* 442 Mich. 76, 84 (1993) ("the sine qua non of the theory of promissory estoppel is that the promise be clear and definite").

{¶ 52} There is no such strict requirement for fraud or breach of contract.  "Fraud is defined as (1) a representation or, where there is a duty to disclose, concealment of a fact; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred; (4) with the intent of misleading another into relying upon it; (5) justifiable reliance upon the representation or concealment; and (6) a resulting injury proximately caused by the reliance*." Martin* at 98, citing *Williams v. Aetna Fin. Co.,* 83 Ohio St.3d 464, 475 (1998).  The trial court instructed the jury

accordingly. Panos' fraud may have flowed from any of his misrepresentations and concealments to appellees; a "clear and definite promise" was not essential to the claim.

{¶ 53} In lieu of a promise by Panos, the fact that he began or rendered performance, for example, by pressing the merger and making a payment to the IRS in advance, sufficed for purposes of contract formation.

> Manifestation of mutual assent to an exchange requires that each party either make a promise or begin or render a performance. Restatement of the Law 2d, Contracts (1981) 53, Section 18. The manifestation of assent may be made wholly or partly by written or spoken words or by other acts or by the failure to act. *Id.* at 55, Section 19(1); see, also, *Terex Corp. v. Grim Welding Co.* (1989), 58 Ohio App.3d 80, 82, 568 N.E.2d 739, 741 (the term "contract" includes every description of agreement or obligation, *whether verbal or written,* whereby one party becomes bound to another to pay a sum of money or to perform or omit to do a certain act).

*McSweeney v. Jackson,* 117 Ohio App.3d 623, 631 (4th Dist.1996). While the terms of the contract must be reasonably certain, this condition is met if the terms "provide a basis for determining the existence of a breach and for giving an appropriate remedy." *Mr. Mark Corp. v. Rush, Inc.,* 11 Ohio App.3d 167, 169 (8th Dist.1983), quoting Restatement of the Law 2d, Contracts, Section 33(2), at 92 (1981).

{¶ 54} When determining whether a jury's verdict should be invalidated because of an irreconcilable inconsistency between the jury's responses to two interrogatories, a reviewing court must construe the jury's responses in light of the trial court's instructions. "If possible, the reviewing court must adopt a view of the case that resolves any seeming inconsistency." *Ragone v. Sentry Ins. Co.,* 121 Ohio App.3d 362, 370 (8th Dist. 1997).

{¶ 55} To decide whether there was a contract between the parties, the trial judge gave the jury this instruction:

> Now, a contract is an agreement or obligation, whether verbal or written, in which one party becomes bound to another to pay a sum of money or to perform or omit to do a certain act or acts. Each party to the contract must have promised to do or not do something in exchange for the other side's promise. It is not necessary that the parties use any particular words, perform any particular acts, or use any particular form of agreement in order to create a contract. Where the parties have intended to conclude a bargain, uncertainty as to

incidental or collateral matters is not fatal to the existence of the contract.

In order to form a contract the parties must mutually consent to the agreement undertaken by them. Mutual consent arises out of the intent of the parties as shown by the reasonable meaning of their words and conduct and not from any unexpressed intention or understanding of either party.

In deciding whether there was mutual consent, you should consider not only the words and the conduct of the parties, but also the circumstances under which the words were used and the conduct occurred. Assent may be manifested fully or partially by written or spoken words or by other acts or by the failure to act.

A contract may be express or implied. An express contract is created by the words or writings of the parties. An implied contract arises from the parties' acts or conduct.

(Tr. Vol. VI, 799-800.)  On appeal, appellants do not challenge the instructions on fraud or breach of contract; they are correct statements of the law.

{¶ 56} Because liability based on promissory estoppel, fraud and breach of contract depend on "distinct standards, the jury's findings were not inconsistent." *Pickney Bros. Inc. v. Robinson,* 194 F.3d 1313 (6th Cir.1999) (jury's finding of vindictive enforcement was not inconsistent with verdict denying punitive damages; vindictive enforcement required "intent to punish plaintiff" while punitive damages required "evil motive or intent, or acted with reckless or callous indifference").  *See State v. Gapen,* 104 Ohio St.3d 358, 2004-Ohio-6548, ¶ 139 (verdicts not inconsistent since prior calculation and design were elements of offense charged in one count but not elements of felony murder in other counts).  We find no conflict between the jury's answer to the first promissory estoppel interrogatory and its answers to the interrogatories for fraud and breach of contract.

{¶ 57} We agree also with the trial court that the jury's answer to the first promissory estoppel interrogatory may be reconciled with the general verdict. "The trial court must harmonize the special findings of the jury with the general verdict if it is possible to do so."  *Altvater v. Claycraft Co.,* 92 Ohio App.3d 759, 764 (10th Dist.1994). Further, "a presumption arises that the jury placed that construction upon the question which makes the answers thereto harmonious with the verdict."  *Id.*

General verdict should stand unless the special findings are necessarily repugnant to it; * * * All special interrogatories

> and answers must be considered before general verdict is supplanted, and any reasonable hypothesis indulged to reconcile answers with it; * * * Special findings of fact override the general verdict only when both cannot stand together, and when the special findings can not by any hypothesis be reconciled with the general verdict.

*Smith v. Pennsylvania RR. Co.*, 35 Ohio Law Abs. 257 (2d Dist.1941).

{¶ 58} In addition to fraud and breach of contract, the general verdicts against Panos followed the jury's findings of liability on indemnification, breach of fiduciary duty, unjust enrichment, and LAN/iB3's breach of contract (for which Panos was held liable via piercing the corporate veil).  The findings independently support the jury's verdicts. Even if we had found an inconsistency between the first promissory estoppel interrogatory and the general verdict, we would sustain the general verdict nevertheless because an inconsistency is "deemed to have been harmless when the jury verdict could have been rendered on multiple bases."  *Cupp v. Kudla,* 158 Ohio App.3d 728, 2004-Ohio-5528, ¶ 28 (7th Dist.2004).

> Where a general verdict is returned for one of the parties, and the mental processes of the jury are not tested by special interrogatories to indicate which issue was determinative of the verdict, it will be presumed that all issues were resolved in favor of the prevailing party, and, where a single determinative issue has been presented free from error, error in presenting another issue will be disregarded.

*Centrello v. Basky,* 164 Ohio St. 41 (1955), paragraph four of the syllabus.  In other words, "a general verdict which is supportable on one or more alternate grounds properly submitted to the jury is invulnerable to attack." *McCarthy v. Kasperak*, 3 Ohio App.3d 206, 208 (8th Dist.1981).  We thus overrule appellants' sixth assignment of error.

### H. Alleged Juror Misconduct

{¶ 59} Appellants assert juror misconduct because a juror may have viewed Panos' LinkedIn profile during trial.  After trial, Panos visited LinkedIn and saw that a "Customer Service Representative at IGS Energy" had viewed his profile in the past week. (Appellants' Brief, 51.)  Juror 1 matched this description and was a LinkedIn member. The timing did not exclude the likelihood that the juror viewed it during the two days after the trial court had dismissed the jury.

{¶ 60} "[I]n a civil action, where the prevailing party is wholly free from fault, and the irregularity or misconduct of the jury, or a juror, is free from intention of wrong, and has in no appreciable way affected the verdict, it should not be disturbed." *Brooks v. Wilson,* 98 Ohio App.3d 301, 305 (9th Dist.1994) (juror's discussion with his dentist about issues that were the focus of the case did not warrant new trial because juror "obtained no information that had not already been presented at trial"), quoting *Armleader v. Lieberman,* 33 Ohio St. 77, 84 (1877). *See Blitz v. Art Iron, Inc.,* 6th Dist. No. L-84-069 (Nov. 16, 1984) (juror's outside discussion with pharmacist was "reprehensible" but did not warrant new trial when juror learned nothing that was not presented at trial).

{¶ 61} "A jury is presumed to follow the instructions given it by the court." *Estate of Beavers v. Knapp,* 10th Dist. No. 07AP-612, 2008-Ohio-2023, ¶ 64. "Misconduct of a jury will not be presumed, but must be affirmatively proved. The law will presume proper conduct on their part. Clear and positive evidence aliunde is necessary to overcome this presumption." (Emphasis sic.) *Lund v. Kline,* 133 Ohio St. 317, 320 (1938). Appellants argue that the trial court should have conducted voir dire of Juror 1 and possibly others. But before a juror can testify to impeach a verdict, the proponent must present outside evidence that the jury received prejudicial information. With exceptions not applicable here, Evid.R. 606(B) requires: "A juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear on any juror, only after some outside evidence of that act or event has been presented."

{¶ 62} As we stated in *Fares v. Scheussler,* 10th Dist. No. 93APE10-1373 (Mar. 31, 1994):

> According to the Staff Notes of Evid.R. 606(B), "the rule conforms to Ohio's *Aliunde Rule.*" Gianelli, Ohio Evidence Manual, 1988, 23. The *Aliunde Rule* holds that " * * * the verdict of a jury may not be impeached by evidence of a member of the jury unless foundation for the introduction of such evidence is first laid by competent evidence * * * from some other source." *State v. Adams* (1943), 141 Ohio St. 423, 427. Further, the "other source" must possess first hand

> knowledge of the jury's allegedly improper conduct. *State v. Schiebel* (1990), 55 Ohio St.3d 71, 75.

(Emphasis deleted.)

{¶ 63} Under this rule, the foundation needed before a juror can testify must be "competent evidence * * * from some other source." *Berge v. Columbus Community Cable Access,* 136 Ohio App.3d 281, 318 (10th Dist.1999). The outside source must possess "firsthand knowledge of the improper conduct." *State v. Schiebel,* 55 Ohio St.3d 71, 75 (1990). An affidavit from a person that lacks firsthand, personal knowledge that the jury considered something improper does not satisfy the rule. *Berge* at 318.

{¶ 64} In *Fares,* plaintiffs' counsel submitted an affidavit stating that jurors had told him that the verdict was intended to punish both parties since the case should have been settled and was a waste of time, jamming up the legal system. We held that the sworn statement of plaintiffs' counsel, who had no firsthand knowledge of the jury deliberations, did not constitute evidence aliunde*.* "As a result, there was no competent evidence before the trial court going to the jury's allegedly improper motive for reaching its verdict in this case." *Id.* at 6.

{¶ 65} In *Berge,* a testifying witness gave an affidavit that the plaintiff would move toward the jurors as they left the courtroom and with tears tried to get their attention. We stated:

> Williamson's affidavit does not demonstrate any first-hand knowledge of any improper jury conduct. Although she states that plaintiff's conduct had an "obvious effect upon the jury" and that "it was obvious the jury verdict was based upon passion and prejudice," Willamson provides no basis whatsoever for her conclusions or for finding that she had any first-hand, personal knowledge of anything improper the jury considered, including first-hand knowledge of jury deliberations. Her affidavit thus does not constitute evidence aliunde*.*

(Emphasis deleted.) *Id.* at 318.

{¶ 66} Likewise, Panos' affidavit that Juror 1 had viewed his LinkedIn profile did not demonstrate first-hand knowledge of improper conduct by her or any of the other jurors. Appellants are at a loss to explain what information Panos had in his profile was prejudicial to him. The profile was admitted into evidence at trial, and Panos does not

delineate any additional parts of his LinkedIn information, or any updates he made to his profile, that the jury used to his prejudice.

{¶ 67} Lacking firsthand knowledge of the jury deliberations and any improper influence on them, Panos' affidavit did not suffice to compel juror testimony to impeach the verdict under Evid.R. 606(B). Without clear and positive evidence of jury misconduct, there was no basis for a new trial, and we overrule appellants' seventh assignment of error to the contrary.

### I. Motion to Modify Case Schedule.

{¶ 68} Following the trial court's declaration of a mistrial, appellants moved for additional time for discovery on the new claims, and were denied. They have not identified what new facts alleged in the amended complaint required additional discovery from their standpoint. The allegations did not involve appellants' personal knowledge, as they claimed Panos had concealed his side deals with Golden Gate all along. Appellants did not require discovery to learn the facts Panos knew, and, according to appellees, withheld from them and the LAN board. Having not specified any new matter in the amended complaint for which they needed discovery, or what depositions or other objects of inquiry they might have pursued, appellants cannot complain that the trial court abused its discretion in denying their motion to modify the case schedule. " 'Abuse of discretion' connotes an unreasonable, arbitrary, or unconscionable attitude." *Maschari v. Tone,* 103 Ohio St.3d 411, 2004-Ohio-5342, ¶ 18, quoting *State v. Hamilton Cty. Bd. of Commrs. v. State Emp. Bd.*, 102 St.3d 344, 2004-Ohio-3122. We can discern neither an abuse of discretion nor prejudice to appellants from the denial of additional time for unspecified discovery. *See Carrier v. Weisheimer Cos., Inc.*, 1oth Dist. No. 95APE04-488 (Feb. 22, 1986). We, therefore, overrule their eighth and final assignment of error.

### IV. Conclusion

{¶ 69} We overrule appellants' first through eighth assignments of error. Therefore, the judgment of the Franklin County Court of Common Pleas is affirmed in all respects.

*Judgment affirmed.*

BROWN, J., concurs,
LUPER SCHUSTER, J., concurs in judgment only.